UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINKLEVOSS CAPITAL FUND, LLC, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL REQUESTED** |
| CHARLES SHREM, | **18 CV 8250** |
| Defendant. | |

Plaintiff Winklevoss Capital Fund, LLC ("WCF") hereby alleges, through its undersigned

counsel, as its Complaint against Defendant Charles Shrem ("Shrem") as follows:

## NATURE OF THE ACTION

1.      Between September 2012 and February 2013, Plaintiff WCF entrusted Defendant

Shrem with a total of $750,000 to purchase bitcoin,[1] a virtual commodity,[2] on its behalf. Shrem,

who was courting an investment from WCF for his bitcoin startup BitInstant LLC ("BitInstant"),

promised to purchase bitcoin for WCF with this money at the "best price." Shrem was given

complete and absolute discretion over the execution of bitcoin purchases for WCF, including

where and when to buy bitcoin. WCF placed complete and absolute confidence in Shrem and

entrusted him to properly invest its funds in bitcoin and to provide an accounting.

---

[1] By common convention, Bitcoin with a capital "B" typically refers to the Bitcoin Network as a whole, whereas bitcoin with a lowercase "b" refers to the virtual commodity of the Bitcoin Network. This naming convention is used throughout this document.

[2] Though often referred to as a "virtual currency," "digital asset," "digital currency," or "cryptocurrency," bitcoin is a commodity as defined in Section 1a(9) of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq. See In re Coinflip, Inc.*, No. 15-29 (CFTC Sept. 17, 2015); *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018), *adhered to on denial of reconsideration*, 2018 WL 3435047 (E.D.N.Y. July 16, 2018). Virtual currency is used throughout this document to refer to the entire ecosystem of virtual commodities and other asset types that are digital in nature.

2.     Unfortunately, Shrem betrayed that confidence. Of $250,000 sent to Shrem between September and October 2012, Shrem has only accounted for approximately $189,000 worth of bitcoin — a $61,000 shortfall that would have purchased 5,000 bitcoin at the time. In mid-2017, after forensic accounting and what the industry calls blockchain analysis, WCF discovered that Shrem used the $61,000 to purchase 5,000 bitcoin *for himself*. Specifically, WCF identified a transaction on the Bitcoin blockchain on December 31, 2012 that records 5,000 bitcoin sent to a Bitcoin address controlled by Shrem. This transaction occurred just weeks after Shrem sent the first tranche of purchased bitcoin to WCF with a shortfall of 5,000 bitcoin.

3.     WCF brings this suit for breach of fiduciary duty and fraud. WCF seeks a constructive trust over 5,000 bitcoin held by Shrem that rightfully belongs to WCF. As of this writing, the 5,000 bitcoin, if converted into U.S. dollars, is worth $31,362,500.[3]

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties to this action are citizens of different states, and the amount in controversy exceeds $75,000.

5.     Venue is proper under 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to this action took place within the Southern District of New York.

## PARTIES

6.     Plaintiff Winklevoss Capital Fund, LLC is a limited liability company organized under the laws of Delaware with its registered address at 301 N. Market Street, Farmers Bank Building, Suite 1463, Wilmington, Delaware 19081. The members of WCF are Delaware limited

---

[3] Notional value is calculated using a bitcoin price of $6,272.50 US dollars as determined by the 4 p.m. Eastern Time Gemini auction on September 10, 2018.

-2-

liability companies whose members are traditional, non-business trusts. The trustees of those trusts are Deutsche Bank Trust Company Delaware, a Delaware corporation with a principal place of business in that state, and two individuals domiciled in Connecticut.[4] WCF is a family office, founded in 2012 by Cameron and Tyler Winklevoss. The firm invests across multiple asset classes with an emphasis on providing seed funding and infrastructure to early-stage startups. In addition, WCF has invested in a number of virtual currency projects, including investing in bitcoin, ether, Zcash, Tezos, and Filecoin.

7.     Defendant Charles "Charlie" Shrem is a citizen of Florida. He is an early bitcoin adopter and the disgraced former CEO of BitInstant, a now defunct company in which WCF had invested. In 2014, Shrem pleaded guilty for his role in selling nearly $1 million of bitcoin to Robert Faiella for drug purchases on Silk Road, an online black market, through BitInstant. *USA v. Faiella, et al.*, S.D.N.Y. Case No. 14-CR-243, Dkt. No. 61 (Rakoff, J.). At the end of 2016, and after his release from federal prison, Shrem moved with his wife to Sarasota, Florida, where he purchased a home and now lives.

## FACTS GIVING RISE TO THE ACTION

### The Winklevoss Brothers Meet Charles Shrem

8.     Beginning in mid-2012, Cameron and Tyler Winklevoss, the principals of WCF, began to investigate investing in virtual currency. These assets are not issued or backed by a government, as is traditional (or "fiat") currency. Rather, virtual currencies are issued according to predetermined algorithms (typically to users known as "miners" who provide computing power to secure the network) and are tracked on a distributed ledger known as a "blockchain."

---

[4] *See Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012); *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 722 (2d Cir. 2017); *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 34, 36 (3d Cir. 2018).

Virtual currencies operate similarly to other decentralized networks and do not rely on a central authority to function. The most popular and well-known virtual currency is Bitcoin, released in 2009.

9.      The Winklevoss brothers were intrigued by the potential of a peer-to-peer money protocol, the underlying blockchain technology, and this new "Internet of Money."

10.     At the time, Bitcoin was in its infancy. Many of the businesses in the Bitcoin ecosystem were undercapitalized and staffed by novices with little background in business, finance, and compliance. Quasi-religious zeal and libertarian optimism often drove the earliest Bitcoin adopters, most of whom lacked the hardheaded business acumen and understanding of financial regulation to properly steward its development. The Winklevoss brothers saw enormous potential if they could help nurture Bitcoin into adulthood.

11.     Two of WCF's first investments in the virtual currency space involved Shrem, whom the Winklevoss brothers met in early 2012.

12.     Shrem often described himself as a "Bitcoin evangelist." Shrem embraced Bitcoin at a time when it seemed a fool's errand to do so. He was a founding member of the Bitcoin Foundation — a nonprofit dedicated to promoting Bitcoin — and was well connected in the small community of Bitcoin's other early pioneers known as "Bitcoiners."

13.     When the Winklevoss brothers first met Shrem, he had just launched BitInstant. BitInstant provided an online platform for buying and selling bitcoin and was both an agent and payment processor for its customers who wished to purchase bitcoin. It ceased operations in or before July 2013 and was completely defunct shortly after Shrem's arrest in 2014. Shrem courted the Winklevoss brothers for an investment in his nascent startup, and the brothers eventually decided to invest.

14.     As part of his effort to court an investment in BitInstant, Shrem promised the Winklevoss brothers that he would help them purchase a large quantity of bitcoin, which they had told him they wanted to do. Shrem told the brothers that he could purchase bitcoin for them, and he promised to do so at the best price. In reliance on that promise, the brothers, through WCF, sent $750,000 to Shrem in several installments between September 2012 and February 2013. They placed great confidence in him and left him with complete and absolute discretion over how to acquire bitcoin, including where and when to buy.

### Shrem Offers to Buy Bitcoin for WCF

15.     Back in 2012 — the early days of Bitcoin — it was difficult to purchase bitcoin, especially in the quantity WCF wanted to acquire. Liquidity was low and the unprecedented size of WCF's contemplated investment would undoubtedly drive up bitcoin's price because of its relatively low market capitalization in 2012. To overcome these obstacles, Shrem offered to help WCF purchase bitcoin by buying on several different venues and spreading out purchases so as not to move the market. Because Shrem was well-connected, WCF believed Shrem could acquire bitcoin in the quantity WCF desired, through both over-the-counter transactions and transactions on bitcoin exchanges.

16.     Shrem offered to purchase bitcoin for WCF at the best price. He never indicated that he intended to charge a commission or transaction fees for his services. A subsequent accounting he provided to WCF confirmed he never contemplated charging such fees. Rather, Shrem's assistance was part of an effort to court an investment from WCF in BitInstant, as well as to ingratiate himself with the Winklevoss brothers, who he believed could help raise the clout and profile of Bitcoin owing to their public recognition.

17.     Shrem's promise to purchase bitcoin for WCF at the best price was memorialized in several emails between Shrem and Cameron Winklevoss.

18.     For instance, on September 12, 2012 — shortly before WCF wired the first money to Shrem — Shrem promised Cameron Winkelvoss that he would "secure . . . the best price" for WCF.

19.     A few months later, when Cameron Winklevoss emailed Shrem at the end of December 2012, Shrem reiterated that he would buy bitcoin for WCF at the lowest possible price.

### WCF Sends Shrem $750,000 to Purchase Bitcoin

20.     In reliance on Shrem's reputation as a Bitcoin expert, as well as his representations that he would secure bitcoin for WCF at the best price, WCF sent Shrem a total of $750,000 between September 2012 and February 2013 in the following installments:

- $50,000 on September 12, 2012;
- $50,000 on September 24, 2012 (in two blocks of $25,000);
- $50,000 on September 28, 2012;
- $50,000 on October 3, 2012;
- $50,000 on October 10, 2012;
- $100,000 on December 28, 2012;
- $200,000 on January 29, 2013; and
- $200,000 on February 6, 2013.

21.     In exchange, WCF received 39,876.34 bitcoin, at an average cost basis of $18.81 per bitcoin. When WCF suspected Shrem's accounting for these purchases was inadequate (as discussed further below), WCF ceased working with Shrem and continued to acquire additional bitcoin in the open market.

### Shrem Promises an Accounting, but the Numbers Do Not Add Up

22.     In addition to promising to buy bitcoin at the best price, Shrem promised WCF an accounting. Specifically, before WCF sent any money, Shrem promised WCF an "overall report once the [bitcoin] are bought, so you can see the average price."

23.     The accounting, however, was not forthcoming. When Shrem finally provided one months after WCF requested it, the accounting was incomplete.

24.     Shrem did not share any accounting figures until January 31, 2013 — more than four months after he first reported he would — when he sent WCF a Google spreadsheet listing several bitcoin purchases he made on WCF's behalf. When Cameron Winklevoss reviewed the spreadsheet, he noticed only 8,500 bitcoin were listed. This was less than half of the 21,237.07 bitcoin Shrem had already sent WCF.

25.     When Cameron Winklevoss inquired about the discrepancy, Shrem responded that the spreadsheet only accounted for transactions sent to one of four Bitcoin addresses controlled by WCF that were set up to receive bitcoin from Shrem. He promised to prepare additional spreadsheets for the other three Bitcoin addresses. In an email to Cameron Winklevoss, Shrem admitted that "the accounting for the other 3 [Bitcoin addresses] is not as good as this one," but he promised to compile the data and enter all of the transactions into a single spreadsheet over the weekend.

26.     Cameron Winklevoss clarified that day with Shrem that he expected, as a proper accounting, (i) the number of bitcoin purchased, (ii) the date they were purchased, (iii) the cost basis of each purchase, and (iv) the Bitcoin address where they were sent. Cameron asked for all of this information on one spreadsheet.

27.     Over the next several weeks, Shrem provided additional details, but his accounting could never fully reconcile the number of bitcoin that WCF had received with the amount of money WCF had sent.

28.     Shrem's figures from September and October 2012 warranted the most attention. During that period, WCF sent Shrem $250,000. Based on Cameron's rough calculations, he suspected that Shrem still owed WCF thousands of bitcoin.

29.     In an effort to clarify the numbers, Cameron and Tyler Winklevoss repeatedly asked Shrem to produce a proper accounting. Cameron wrote to Shrem on February 19, 2013, "I have been asking for [an accounting] for weeks (if not months). I have been patient and at this point it's getting a bit absurd . . . I need the cost basis for every coin you have purchased for me, and by my current back of the envelope calculations I am short 1000s of coins that should have been bought and sent to me over the past 5-6 months. I don't take this lightly."

30.     At first, Shrem responded that he had been "updating" the spreadsheet sent to WCF in January, and he had added a tab called "Older Buys" that purported to account for the missing coin. But it was incomplete. On February 20, 2013, Shrem sent Cameron an email entitled "Spreadsheet," wherein he admitted that he was still missing accounting data. He wrote,

> "Hey,
>
> See the sheet, I've updated and merged. There is still some earlier data missing, but I'm filling it in as I find it.
>
> Thanks,
>
> Charlie"

31.     Two days later — and months after Cameron had asked for a proper accounting — Shrem asked Cameron for the amount of money that WCF had wired to Shrem in September and October 2012, indicating that Shrem was not keeping proper records. Cameron had his

accountant send Shrem the information within an hour. Shrem later asked for similar figures between October 2012 and February 2013, which the accountant also sent.

### Alarmed by Shrem's Accounting, WCF Hires an Accountant to Review Shrem's Numbers

32.     On February 25, 2013, WCF engaged Richard Paukner & Associates, LLC, Certified Public Accountant ("Paukner"), to perform an audit.

33.     Matthew Gruchevsky, an associate at Paukner, met with Shrem at the BitInstant offices two days later, on February 27, 2013. Shrem provided Gruchevsky with a general understanding of the Bitcoin market and BitInstant's business model, and discussed his accounting for WCF.

34.     After the meeting, Shrem provided Gruchevsky with a spreadsheet of all of the purchases he had made on WCF's behalf, the most complete accounting Shrem has ever provided. It lacked essential details, particularly for the period between September 12 and October 10, 2012, when WCF sent Shrem the initial tranche of $250,000. The spreadsheet provided WCF only with the number of bitcoin acquired and transferred to WCF during this period, but failed to include the price paid per bitcoin or a running balance of WCF's funds — both essential features of a proper accounting.

35.     With information provided by WCF and Shrem, as well as publicly available historical bitcoin pricing data, Gruchevsky performed an audit of Shrem's accounting to determine if any bitcoin were missing, and, if so, how many. After reviewing (i) the dates Shrem purported to acquire the bitcoin, (ii) the purchase price reported by Shrem or, when that was not provided, the average price of bitcoin on those dates, and (iii) the amount of bitcoin Shrem acquired and sent to WCF on those dates, Gruchevsky found that out of nine transactions Shrem listed between September 12, 2012 and October 10, 2012, Shrem could only account for

-9-

approximately $189,000 of WCF's $250,000. In other words, there was an imbalance of

$61,000, which accounted for a shortfall of approximately 5,000 bitcoin, based on an average

weighted closing price of bitcoin during this period of $12.15 per bitcoin.[5] A copy of the Paukner

firm's report is attached hereto as Exhibit A.

36.     Under no possible circumstances did Shrem's figures adequately account for the

bitcoin acquired for and sent to WCF in September and October, 2012. During that period,

Shrem acquired 15,237.07 bitcoin for WCF. Bitcoin reached a high of $12.89 per coin during

this period. Thus, the most Shrem could have spent on the bitcoin is $196,405.83.

37.     This was not an isolated incident. For example, Cameron and Tyler Winklevoss

introduced Matthew Mellon to Shrem, who purchased bitcoin for Mellon as well. Mellon too

noticed a shortfall in the bitcoin actually delivered. Shrem turned it over after receiving a

demand from counsel.

38.     Shrem disputed Gruchevsky's findings and said he would respond with proper

figures.

39.     Shrem never provided any additional information to Gruchevsky or WCF.

### Evidence Emerges that Shrem Stole WCF's 5,000 Bitcoin

40.     Shrem never provided an accurate accounting because, in fact, he stole the 5,000

bitcoin that rightfully belonged to WCF.

41.     In mid 2017, WCF engaged the services of Elliptic Inc. ("Elliptic"), a blockchain

forensic accounting firm, to determine whether Elliptic could identify any bitcoin held by Shrem.

---

[5] Gruchevsky determined that the $500,000 WCF sent to Shrem between December 2012 and February
2013 was accounted for.

42.    After reviewing Bitcoin Internet chat forums, Elliptic discovered a post from April 2014 on bitcointalk.org where Shrem publicly acknowledged owning a "vanity" Bitcoin address that included his last name — 1Shremdh9tVop1g xMzJ7baHxp6XX2WWRW ("1Shrem").

43.    After discovering this Bitcoin address, Elliptic reviewed the blockchain to determine whether that address still held any bitcoin, or whether any of the missing bitcoin owed to WCF might have passed through the address.

44.    While the address no longer holds any bitcoin, Elliptic found that the 1Shrem Bitcoin address received 5,000 bitcoin on December 31, 2012.[6] That was essentially identical to the shortfall identified by Gruchevsky as part of his audit, and took place suspiciously close in time to the September/October 2012 period in which Shrem could not properly account for 5,000 bitcoin.

45.    Elliptic determined that approximately 4,000 of the 5,000 bitcoin was eventually deposited into two bitcoin exchanges, Coinbase and Xapo, with the remainder sent to other addresses.[7]

### Shrem has Never Provided an Adequate Explanation for the Missing Bitcoin

46.    WCF has repeatedly confronted Shrem about the missing bitcoin. Shrem has been unable to provide a proper accounting or explanation.

---

[6] Specifically, on December 31, 2012 at 5:07p.m., the blockchain recorded a transfer of 5,000 bitcoin from bitcoin address 15kN4RRGAWapscJjSg1VEKbrWtNf192pwk to 1Shrem.

[7] Specifically, thirty-four minutes after the 1Shrem address received 5,000 bitcoin, it sent that same amount to another bitcoin address, 1MQ3K9aPcEDCek pFBGyDAgtD1uPss 8E7rY. The 5,000 bitcoin sat there for nearly a year, when on November 3, 2013 at 6:37p.m. the bitcoin moved to yet another address, 1JMPofaycssfjTNUYXNzBFLHdNjJhwB9qN. That same day, at 6:46p.m., 2,500 bitcoin was transferred to Coinbase, a bitcoin exchange and vault that stores bitcoin like a bank on behalf of users. Subsequently, on April 20, 2014, at 8:58p.m., 1,499 coin was transferred from 1JMPofaycssfjTNUYXNzBFLHdNjJhwB9qN to Xapo, another bitcoin vault.

### Shrem Has Bragged About Being a "Bitcoin Millionaire"

47.    According to a December 2013 profile on the website Vocative, Shrem purchased

"many thousands" of bitcoin but declined to specify how many.[8] In April 2013, Shrem told the

New York Observer, "I've made a decent amount, just because I'm a smart investor . . . Every

time the price [of bitcoin] is up by 20 percent, I'll sell a few hundred coins, or whatever it is."[9]

The New York Times reported in February 2014 that Shrem "went through millions of dollars'

worth of Bitcoin over the years."[10]

48.    In January 2014, The New York Post reported that, following his arrest,

prosecutors "said Shrem bragged about having a $6 million bitcoin fortune." According to an

Associated Press article summarizing a January 27, 2014 bail hearing:

> Assistant U.S. Attorney Serrin Turner said Shrem "has held himself out as a 'Bitcoin
> millionaire'" who was ready to flee rather than face charges that could put him in prison
> for nine to 11 years.
>     Turner said the nature of the Bitcoin industry meant that Shrem had a "storage
> locker in the clouds" with money to facilitate flight . . . Turner played a video interview
> of Shrem posted online in which the Manhattan resident boasted that if the government
> tried to make arrests or take down companies that promote the use of Bitcoin, "I have a
> plane ticket ready to take me to Singapore. There's another corporation already set up."

### FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

49.    Plaintiff incorporates by reference the allegations contained in the preceding and

subsequent paragraphs as if fully set forth herein.

50.    Defendant Shrem promised to purchase bitcoin for WCF at the best price. Shrem

also promised to provide an accounting for those purchases. WCF placed complete and absolute

---

[8] http://www.vocativ.com/tech/bitcoin/night-bitcoin-millionaire-proud-stoner-charlie-shrem/
[9] "It's All About the Bitcoin, Baby," The New York Observer, April 30, 2013.
[10] "Problems barely subdue a bitcoin evangelist," International New York Times, February 8, 2014.

trust and confidence in Shrem and sent him a total of $750,000. Shrem was given complete and absolute discretion over the execution of bitcoin purchases for WCF, including where and when to buy bitcoin. As a consequence, Shrem became a fiduciary of WCF with respect to the purchase of bitcoin on its behalf.

51.      Defendant Shrem was required to act with the utmost good faith and undivided loyalty on behalf of Plaintiff WCF with respect to the money entrusted to Shrem to purchase bitcoin.

52.      Shrem breached his fiduciary duties by failing to properly account for WCF's $750,000, and by purchasing 5,000 bitcoin for himself using WCF's money.

53.      Shrem committed this breach of fiduciary duty with a high degree of moral culpability warranting the award of punitive damages. He willfully, wantonly, dishonestly, and/or maliciously abused the trust and confidence that WCF placed in him to profit at WCF's expense in violation of the fiduciary duties he owed.

### SECOND CLAIM FOR RELIEF

#### (Fraud)

54.      Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth herein.

55.      Defendant Shrem promised to purchase bitcoin for WCF at the best price and to provide an accounting for such purchases.

56.      Those statements were false, and Shrem knew those statements were false at the time he made them.

57.      Plaintiff WCF sent Defendant Shrem $750,000 in reliance on his statements that he would purchase bitcoin for WCF at the best price and that he would provide an accounting.

58.     Plaintiff WCF reasonably relied on Shrem's statements when he promised to purchase bitcoin for it at the best price because Shrem was known at the time as an upstanding member of the Bitcoin community, including as a founding member of the Bitcoin Foundation.

59.     Plaintiff WCF was injured by Defendant Shrem's representation that he would purchase bitcoin for WCF at the best price and provide an accounting. WCF has been deprived of 5,000 bitcoin that it would have received were it not for Shrem's fraud.

60.     Shrem committed this fraud with a high degree of moral culpability warranting the award of punitive damages. He willfully, wantonly, dishonestly, and/or maliciously made false statements to induce WCF to transfer funds to him that he used for his own purposes.

### THIRD CLAIM FOR RELIEF

### (Imposition of a Constructive Trust)

61.     Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth herein.

62.     WCF entrusted Shrem with $750,000 of its money, based on a high degree of confidence placed in Shrem.

63.     Shrem promised to act on WCF's behalf by purchasing bitcoin for WCF at the best price and to provide an accounting of all bitcoin purchased.

64.     In reliance on Shrem's promise, WCF transferred $750,000 to Shrem between September 2012 and February 2013.

65.     Shrem was unjustly enriched in the amount of 5,000 bitcoin after he failed to account for approximately $61,000 sent from WCF to Shrem, which Shrem used to purchase 5,000 bitcoin that he ultimately transferred to himself.

-14-

66.     Equity and good conscience require that a constructive trust be imposed on any bitcoin or other asset or benefit obtained, held or retained by Shrem or his agents to prevent his unjust enrichment.

## FOURTH CLAIM FOR RELIEF

### (Accounting)

67.     Plaintiff incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth herein.

68.     Plaintiff WCF stood in a confidential relationship of trust with Defendant Shrem when it entrusted to Shrem $750,000 to buy bitcoin on its behalf.

69.     Shrem promised to purchase bitcoin for WCF at the best price and to provide an accounting.

70.     WCF repeatedly demanded a proper accounting to explain how the $750,000 was spent, yet Shrem was never able to provide a complete accounting.

71.     WCF demands a proper accounting from Shrem, including disclosure of all records that will reveal what happened to the approximately $61,000 that Shrem cannot account for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendant as follows:

1.     For an award of compensatory damages from Defendant in an amount to be proven at trial (calculated as the highest intermediate value of 5,000 bitcoin between the time of the wrongdoing and the time of trial or as otherwise calculated in accordance with the Court's

instructions) issued in U.S. currency, or alternatively in bitcoin pursuant to New York Judicial Law § 27(b);

2.    For an award of punitive damages from Defendant in an amount to be proven at trial;

3.    For imposition of a constructive trust over and disgorgement of all funds, bitcoin, or other tangible or intangible things of value improperly obtained by Defendant to prevent his unjust enrichment;

4.    For attorneys' fees and costs according to proof;

5.    For pre-judgment and post-judgment interest; and

6.    For such other and further relief as the Court deems just and proper.

Dated: September 11, 2018              Respectfully submitted,


By: _____

Tyler Meade
THE MEADE FIRM p.c.
California Office:
    12 Funston Ave., Suite A
    San Francisco, CA  94129
New York Office:
    111 Broadway, Suite 2002
    New York, NY 10006
Telephone: (415) 724-9600
tyler@meadefirm.com

Attorneys for Plaintiff