UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINKLEVOSS CAPITAL FUND, LLC, | Case No. |
| Plaintiff, | **EX PARTE APPLICATION FOR PREJUDGMENT ATTACHMENT** |
| v. | **18 CV 8250** |
| CHARLES SHREM, | |
| Defendant. | |

## I.  INTRODUCTION

Concurrent with the Complaint against Charles Shrem filed herewith, Plaintiff

Winklevoss Capital Fund ("WCF") moves ex parte (and under seal) for prejudgment attachment

of up to 5,000 bitcoin[1] owned or controlled by Defendant Shrem. WCF brings this application

pursuant to New York Civil Practice Law and Rules sections 6201, 6211 and 6212, and Federal

Rule of Civil Procedure 64, which allows this Court to order attachment where authorized by

state law.

Defendant Shrem is now best known for being Bitcoin's "First Felon," but this dispute

arises from unrelated misconduct. In late 2012, Shrem was a budding Bitcoin entrepreneur.

Amongst the people he sought to work with were Cameron and Tyler Winklevoss, WCF's

principals, who were exploring investments in the virtual currency[2] space. Along with soliciting

---

[1] By common convention, Bitcoin with a capital "B" typically refers to the Bitcoin Network as a whole, whereas bitcoin with a lowercase "b" refers to the virtual commodity of the Bitcoin Network.

[2] Though often referred to as a "virtual currency," "digital asset," "digital currency," or "cryptocurrency," bitcoin is a commodity as defined in Section 1a(9) of the Commodity Exchange Act, 7 U.S.C. § 1a(9). *See In re Coinflip, Inc.*, No. 15-29 (CFTC Sept. 17, 2015). "Virtual currency" is used throughout this document to refer to the entire ecosystem of virtual

WCF's investment in his new business, Shrem also offered to assist WCF in purchasing bitcoin. Believing Shrem's statements that he was acting out of a desire to help, WCF sent Shrem a total of $750,000 to buy bitcoin, which Shrem promised to do "at the best price."

Instead, Shrem stole WCF's money and used it to purchase bitcoin for himself.

A forensic accounting reveals that Shrem diverted approximately $61,000 of the $750,000 entrusted to him to purchase bitcoin for his own account. At then prevailing prices, he was able to purchase and pocket approximately 5,000 bitcoin. Expert analyisis of the blockchain (Bitcoin's distributed ledger that reflects every bitcoin transaction ever made) performed by Elliptic Inc. ("Elliptic"), a bitcoin forensic investigation firm, shows that Shrem made a transfer of exactly that amount of bitcoin shortly after WCF's $61,000 went missing, and that 3,999 of this bitcoin was thereafter transferred to two U.S.-based bitcoin firms — virtual currency wallet provider, Xapo, Inc., and another firm, Coinbase, Inc., that provices both wallet and exchange services.

This application seeks an order attaching up to 5,000 bitcoin, or the equivalent, perfected through a levy on Defendant Shrem and levies on third party garnishees with a presence in New York that are in possession or custody of Shrem's property. *See* N.Y. C.P.L.R § 6214(b). Pursuant to N.Y. C.P.L.R.section 6214(a), the levy may reach "any interest of the defendant in personal property."

WCF seeks to attach the following: (a) any bitcoin, other virtual currency, or fiat currency held by Shrem in four firms that provide virtual currency wallet and/or exchange services in New York, i.e., the above-referenced Xapo and Coinbase plus Bittrex, LLC and Poloniex, Inc.; (b) any

---

commodities and other asset types that are digital representations of value that function as a medium of exchange, a unit of account, and/or a store of value.

bitcoin or other virtual currency held by Shrem in any other virtual currency wallets or exchanges, or stored electronically on a data storage device in his possession; and/or (c) any other personal property (including intangible assets) held by Shrem necessary to satisfy the requested attachment, including his two powerboats and his two Maseratis. *See* N.Y. C.P.L.R. § 6214(b); *Hotel 71 Mezz Lender LLC v Falor*, 14 N.Y.3d 303, 312 (2010) (jurisdiction to attach intangible property in the hands of nondomiciliaries).

Prejudgment attachment is necessary and appropriate. Shrem's previous acts — including not only the theft and subsequent cover-up at issue in this suit, but also Shrem's failure to pay a criminal judgment of $950,000 that he owes to the federal government — indicate an intent to secret assets for the purpose of evading creditors. Furthermore, the asset itself — bitcoin — is easy to move nearly instantaneously and without detection. WCF is likely to prevail on its claims and thus is entitled to an attachment order to ensure that assets are available to satisfy a judgment.

## II.   EVIDENTIARY FACTS

### A.   Shrem's Theft from WCF

As more fully alleged in the Complaint and described in the affidavits filed herewith, this dispute arises from Defendant Shrem's offer to help Plaintiff WCF in acquiring bitcoin. Declaration of Cameron Winklevoss ("Winklevoss Decl.") ¶ 6. Believing that Shrem was acting in WCF's interests, WCF entrusted him with $750,000 to purchase bitcoin on its behalf — when and where he deemed appropriate. *Id.* ¶¶ 9-10. Shrem promised to buy the bitcoin "at the best price" and to provide a full accounting. *Id.* ¶ 8, Exs. A & B.

Shrem, however, did not give WCF all the bitcoin it was owed, nor a full accounting. *Id.* ¶¶ 13-24, Ex. H. Shrem eventually sent WCF a total of 39,876.34 bitcoin and a partial report

-3-

purporting to detail some of his purchases. *Id.* ¶¶ 11, 24-25, Ex. H. After WCF realized that it received thousands of bitcoin less than what it should have received, it engaged Matthew Gruchevsky from Paukner and Associates in late February 2013 to audit Shrem's accounting. *Id.* ¶ 19. Gruchevsky concluded that Shrem could not account for approximately $61,000 of the $250,000 sent to Shrem in September and October 2012, which, at the time, would have purchased approximately 5,000 bitcoin. Declaration of Matthew Gruchvesky ("Gruchevsky Decl.") ¶ 9.

WCF repeatedly demanded a full accounting from Shrem. Winklevoss Decl. ¶¶ 12-18, EX. E, F & G. Shrem also promised Gruchevsky that he would follow up with him and provide additional details after the two met in February and March of 2013. Gruchevsky Decl. ¶¶ 5, 17-22. Yet Shrem has never provided the additional details that would complete his accounting. Winklevoss Decl. ¶ 27; Gruchevsky Decl. ¶ 22.

As WCF has only recently learned, Shrem's evasive behavior and incomplete accounting masked the fact that he actually stole the $61,000 from WCF and converted it into 5,000 bitcoin for himself. In July 2017, WCF hired Elliptic, a London-based bitcoin forensic investigation firm that works with financial institutions and law enforcement, to determine if Elliptic could trace any bitcoin held by Shrem. Winklevoss Decl. ¶ 28; Declaration of Tom Robinson ("Robinson Decl.") ¶ 4. Amongst its findings, Elliptic discovered that Shrem likely received 5,000 bitcoin on December 31, 2012 — just weeks after he conveniently could not account for 5,000 bitcoin that he should have purchased for WCF. *Id.* ¶ 40–41, Ex. G.

Elliptic's investigation traced the movement of 3,999 of those bitcoin through a series of blockchain addresses to addresses that are associated with bitcoin exchange Coinbase and bitcoin wallet Xapo. *Id.* ¶ 43–44, Exs. I, J, K. Specifically, an address associated with Shrem received

-4-

5,000 bitcoin on December 31, 2012, which was then transferred to an unknown address an hour later. *Id.* ¶ 41– 42, Exs. G, H. Eleven months later, the 5,000 bitcoin was transferred to a second unknown address. *Id.* ¶ 43, Ex. I. Two minutes later, 2,500 bitcoin was transferred to an address associated with Coinbase. *Id.* ¶ 43, Ex. J. Six months later, 1,499 bitcoin was transferred to an address associated with Xapo.  *Id.* ¶ 44, Ex. K.

**B.    Other Facts Indicating a Need for a Security Interest**

Shrem currently resides in Florida, and is therefore a nondomiciliary. Declaration of John Mason ("Mason Decl.") at ¶ 1, Ex. A p. 3 (interviewer noting Shrem "lives in Florida"), p. 17 (Shrem states, "I'm taking a lot of Bitcoin and selling it as the price goes up and putting it into real estate, especially down in Florida where we live."). As part of his plea deal in 2014, he agreed to forfeit $950,000 to the federal government. *USA v. Faiella, et al.*, S.D.N.Y. Case No. 14-CR-243, Dkt. No. 61 (Rakoff, J.). To date, no Satisfaction of Judgment has been entered on the docket in Shrem's criminal case, and the debt appears not yet to have been paid, Declaration of Sam Ferguson ("Ferguson Decl.") ¶ 2, even though Shrem has acquired substantial assets since leaving prison in mid 2016.

Indeed, Shrem has been on a steadily increasing buying spree since July of last year, paying cash for (i) more than $4 million in real estate in and around Sarasota, Florida, (ii) two Maseratis, and (iii) two power boats. Most of these assets were acquired in just the last six months, including a $2.25 million property purchased on July 27, 2018; a $370,000 property purchased on June 19, 2018; two properties worth a combined $825,000 in March 2018; and one Maserati in July 2018. In addition, he appears to be lending money: a limited liability company he formed recently made a loan of $250,000. Mason Decl. ¶¶ 3-8, Exs. B-G. In addition to Coinbase and Xapo, Elliptic's research indicates that Shrem may also hold bitcoin on other

exchanges including Bitfinex, Bitstamp, BITTREX, BTC-e, Changelly, Cryptsy, Kraken, LiveCoin, Local Bitcoins, MtGox, Orderbook, and Poloniex, and that he likely holds bitcoin directly at various bitcoin addresses. Robinson Decl. ¶ [ ].

For years before he went to prison, Shrem claimed to be one of Bitcoin's first millionaires. Mason Decl. ¶ 2, Ex. A (*It's all about the Bitcoin, Baby*, April 30, 2013, Observer, noting "Mr. Shrem claims to have made more than a million dollars off of his bitcoin investments"). Shrem recently claimed in a media interview on New York's WNYC that he spent most of his assets on his legal defense in 2014, and that he went to prison with just $16,000, including just "three or four bitcoin." *Id.* He also said in that same interview that he did not track bitcoin while he was in prison; that after his release in July 2016 he worked as a dishwasher for six months as part of his parole; and that after his release he did not use a computer for two months, meaning he did not begin to reacquire bitcoin — presumably with his earnings as a dishwasher — until at least September 2016. *Id.*

Shrem's self-serving story of insolvency and hard-times lies in stark contrast to his publicly-visible hard assets of well over $4 million, most of which he acquired in just the last few months. If Shrem's public statements that he only holds 33% of his assets in real estate are to be credited,[3] Shrem's net worth is currently over $12 million. Either Shrem has been incredibly lucky and successful since leaving prison, or — more likely — he "acquired" his six properties, two Maseratis, two powerboats and other holdings with the appreciated value of the 5,000 bitcoin he stole from WCF back in 2012.

---

[3] *See* Mason Decl. ¶ 2, Ex. A (Shrem tweeted on November 5, 2017 that "I try to keep my assets balanced like this: 33% crypto — 33% cash, medals & low risk liquid investments — 33% income producing real estate.").

### III.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 64 a federal court has the power to issue a

prejudgment attachment order whenever such an order would be authorized under state law. *See*

Fed. R. Civ. P. 64(a) ("[E]very remedy is available that, under the law of the state where the

court is located, provides for seizing a person or property to secure satisfaction of the potential

judgment."); *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 671 (S.D.N.Y. 2017).

New York law permits a plaintiff to obtain an order for prejudgment attachment under the

following four conditions:

1)   Plaintiff has stated a claim for a money judgment;

2)   Plaintiff has a probability of success on the merits;

3)   One or more of the grounds for attachment listed in N.Y. C.P.L.R. section 6201
     exist; and

4)   The amount demanded exceeds all counterclaims known to the plaintiff.

*See* N.Y. C.P.L.R. §§ 6201, 6212(a); *see also Bank Leumi Trust Co. of New York v. Istim, Inc.*,

892 F. Supp. 478, 481 (S.D.N.Y. 1995). "As to the first and second requirements, *i.e.*, that a

claim for a money judgment exists and that the movant is likely to succeed on the merits, 'the

court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from

the facts.'" *Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, 2009 WL 636952, at *3 (S.D.N.Y. Mar. 6,

2009) (quoting *Bank Leumi*, 892 F. Supp. at 482). And, "'[t]o satisfy the second requirement, [the

plaintiff] must simply 'demonstrate that it is more likely than not that it will succeed on its

claims.'" *Id.* (quoting *Thornapple Assocs., Inc. v. Sahagen*, 2007 WL 747861, at *4 (S.D.N.Y.

Mar. 12, 2007)).

With regard to the third requirement, the grounds for attachment listed in N.Y. C.P.L.R. section 6201 include two relevant to this suit. Attachment is proper where either "the defendant is a nondomiciliary residing without the state," N.Y. C.P.L.R. § 6201(1), or where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." N.Y. C.P.L.R. § 6201(3).

Procedurally, New York law permits a court to attach a defendant's property without notice and even before service of a summons. *See* N.Y. C.P.L.R. § 6211 ("An order of attachment may be granted without notice, before or after service of summons and at any time prior to judgment[.]") Any debt or property against which a money judgment may be enforced is subject to attachment. N.Y. C.P.L.R. § 6202. So long as the court has jurisdiction over a defendant or garnishee, it also possesses the necessary jurisdiction over the defendant/garnishee's assets, regardless of their location. *See Hotel 71 Mezz Lender*, 14 N.Y.3d at 312 ("Based on the foregoing, a court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York").

The ex parte procedure is authorized, in part, to allow a Plaintiff to seek attachment where a Defendant may secret assets away if given notice. *See* N.Y. C.P.L.R. § 6210, practice commentaries ("In some attachment situations (e.g., CPLR 6201(3)), it may be easy enough for the plaintiff to show that the defendant is likely to abscond with assets if given any kind of advance notice of a possible restraint. In the absence of such showing, the plaintiff must make a

good faith effort to notify the defendant of the TRO application and provide him an opportunity to appear in response.").

A Plaintiff must move to confirm an order of attachment granted without notice within five days after levy of the order, with notice given to the defendant and the garnishee (if any), unless the defendant is not a citizen of New York, in which case the Plaintiff must move for confirmation within ten days. N.Y. C.P.L.R. § 6211(b). The procedure is intended to ensure that the ex parte attachment procedure comports with due process, giving the defendant a prompt opportunity to contest the ex parte attachment. *See id.*, practice commentaries.

To confirm an order of attachment, a plaintiff must show "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in [N.Y. C.P.L.R. section 6201] exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. C.P.L.R. § 6212(a); *see also Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 219 (2d Cir. 2006).

In order to secure an attachment order a plaintiff must post an undertaking of at least $500, in an amount to be determined by the court. *See* N.Y. C.P.L.R. § 6212(b); *see also Herzi v. Ateliers De La Haute-Garonne*, 2015 WL 8479676, at *3 (S.D.N.Y. Oct. 13, 2015) (finding undertaking of $10,000 appropriate to cover potential costs and damages associated with attachment of $1.5 million); *Hume v. 1 Prospect Park ALF, LLC*, 137 A.D.3d 1080, 1081 (N.Y. App. Div. 2016) (setting undertaking of $2,500 against attachment of $5 million).

Where a plaintiff moves to attach assets held by a garnishee, the garnishee must provide a statement within ten days of service of the levy "specifying all debts of the garnishee to the defendant, when the debts are due, all property in the possession or custody of the garnishee in which the defendant has an interest, and the amounts and value of the debts and property

-9-

specified." N.Y. C.P.L.R. § 6219. The Court may order that the Garnishee provide such a statement within a shorter period of time, but may not extend the deadline. *Id*. If the Garnishee holds assets sufficient to satisfy the entirety of the requested attachment, the Garnishee may limit its statement to that fact. *Id*.

## IV.  ARGUMENT

### A.  Plaintiff Asserts Claims for Money Damages and Defendant Has No Counterclaims

The first and fourth requirements for prejudgment attachment under New York Law are easily satisfied here. Plaintiff has asserted causes of action for breach of fiduciary duty and fraud, both of which seek money damages, and has submitted declarations supporting the allegations in its Complaint. *See* Compl. ¶¶ 49-60; Winklevoss Decl.; Gruchevsky Decl.; Robinson Decl.; Mason Decl. As indicated by the Winklevoss Declaration, Plaintiff does not believe that Shrem has any counterclaims to assert. C. Winklevoss Decl. ¶ 30.

Moreover, even if Shrem were to assert counterclaims, such assertions would still be insufficient to avoid attachment. New York law directs courts to "examine only the amount of the counterclaims *that the plaintiff concedes are just*," and, as indicated by the Winklevoss Declaration, WCF does not make any such concessions. *Bank Leumi Trust Co.*, 892 F. Supp. at 482; *see also Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, 2009 WL 636952, at *3 (S.D.N.Y. Mar. 6, 2009).

### B.  Two of the Statutory Grounds for Attachment Are Present

N.Y. C.P.L.R. section 6201 enumerates five alternative grounds for attachment, of which two apply here. First, attachment may be requested where the defendant is "a nondomiciliary residing without the state." N.Y. C.P.L.R. § 6201(1). This is proper in this case, as Shrem

-10-

currently lives in Florida. Mason Decl. ¶ 2, Ex. A.[4] In practice, courts generally refrain from granting attachment orders based solely on N.Y. C.P.L.R. section 6201(1), instead requiring a further showing that the defendant is either likely to lack sufficient assets to satisfy an adverse judgment, or is likely to hide or dispose of assets. *See Plaintiff Funding Holding, Inc. v. Carrera*, 2017 WL 7411183, at *3 (E.D.N.Y. Feb. 6, 2017) (citing cases). As a result, in many cases the analysis under N.Y. C.P.L.R. section 6201(1) stands or falls with the analysis under N.Y. C.P.L.R. section 6201(3).

Under this latter provision, attachment is proper if the defendant has "assigned, disposed of, encumbered or secreted property" with "intent to defraud his creditors." N.Y. C.P.L.R. § 6201(3). The allegations and evidence that WCF offers here closely parallel those in *Mineola Ford Sales Ltd. v. Rapp*, 242 A.D.2d 371 (N.Y. App. Div. 1997), where the court found that attachment was justified because the defendant had "falsified business business records and accounting ledgers and diverted the plaintiff's funds for her own personal use" and "offered no explanation as to what had happened to hundreds of thousands of dollars belonging to the plaintiff while the funds were under her control." *Id.* at 371-72; *see also Arzu v. Arzu*, 190 A.D.2d 87,92 (N.Y. App. Div. 1993) (inferring that defendant secreted assets with intent to defraud based on defendant's "patently incredible and almost entirely undocumented explanation" of the disposition of plaintiff's funds and failure to provide plaintiff with an ongoing accounting or contemporaneous record of his use of funds).

---

[4] Shrem lived in Brooklyn during 2012 and 2013. BitInstant was based in Manhattan. All of the relevant wrongdoing alleged herein was transacted in Brooklyn and Manhattan. Winklevoss Decl. ¶ 31. Pursuant to New York's long-arm statute, this is a sufficient basis to assert jurisdiction over Defendant Shrem. N.Y. C.P.L.R. § 302. It also provides the basis for personal jurisdiction in the Southern District of New York. Fed. R. Civ. P. 4(k)(1).

Moreover, Shrem's intent to evade creditors is apparent not only from his conduct towards WCF, but also towards the federal government. *See VisionChina Media Inc. v. Shareholder Rep. Servs.*, LLC, 109 A.D.3d 49, 60 (N.Y. App. Div. 2013) (defendant's intent to be inferred from past and present conduct, including the defendant's history of paying creditors and any statements or action evincing an intent to dispose of assets). As part of his plea deal Shrem agreed to forfeit $950,000. To date, that debt appears to have gone unpaid. Ferguson Decl. ¶ 2. There is no satisfaction of judgment on the criminal docket in his case. Although WCF is not privy to Shrem's discussions with the government and therefore does not know what statements he may have made to explain his failure to pay, Shrem has stated publicly that he lost almost all of his assets before he went into prison, stating in one interview that he began his sentence with only "3-4 bitcoin" and $16,000. *See* https://www.wnycstudios.org/story/a-bitcoin-mogul-goes-broke-death-sex-money/ at 24:35-25:10. The evidence that WCF submits, in particular the results of Matthew Gruchevsky's investigation, indicates that his statement was false — rather than being nearly broke, Shrem appears to have had access to thousands of bitcoin through this entire timeperiod, and has simply denied the fact of their existence.

Furthermore, in just over a year since being released from prison and allegedly working for months as a dishwasher at just $8 per hour, Shrem has now amassed real estate holdings in and around Sarasota worth over $4 million, in addition to two Maseratis and two powerboats. Available records indicate Shrem paid cash for these assets. *See generally* Mason Decl. Shrem's sudden increase in his personal fortune is likely owing to the appreciation of assets — 5,000 bitcoin — that he stole from WCF in 2012 and secreted away.

C.     **WCF Is Likely to Prevail on the Merits**

WCF is likely to prevail on the two causes of action that entitle it to monetary relief,

breach of fiduciary duty and fraud.

1.     **Shrem Breached a Fiduciary Duty by Purchasing Bitcoin for His Own Account Using WCF Funds**

The existence of a fiduciary duty depends on the nature of the relationship between the

parties. "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed

by one person in the integrity and fidelity of another. It is said that the relationship exists in all

cases in which influence has been acquired and abused, in which confidence has been reposed

and betrayed." *Penato v. George*, 52 A.D.2d 939, 942 (N.Y. App. Div. 1976). For instance, a

fiduciary relationship "exists between two persons when one of them is under a duty to act for or

to give advice for the benefit of another upon matters within the scope of the relation." *EBC I,*

*Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) (quoting Restatement [Second] of Torts §

874, Comment a); *see also Board of Managers of Fairways v. Fairway at North Hills*, 193

A.D.2d 322, 325 (N.Y. App. Div. 1993) ("'Fiduciary' is one who transacts business, or handles

money or property, which is not his or for his own benefit, but for benefit of another person, as to

whom he stands in relation implying good faith and necessitating great confidence and trust on

one part and high degree of good faith on other part").

Shrem was entrusted with using each tranche of money deposited with him to purchase

bitcoin at prevailing prices and within a reasonable period of time. Shrem was given — and he

accepted — discretion over all other details, such as the sellers, the exact time and quantities of

each transaction, and by extension the exact prices. C. Winklevoss Decl. ¶ 9. This grant of

discretion over the disposition of WCF's funds is a well-recognized basis that creates fiduciary

obligations. *See Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 93 Misc. 2d 941, 944

(Sup. Ct. 1978) ("The broker, once he has received his customer's funds, is a fiduciary with respect to those funds"); *Jaksich v. Thomson McKinnon Sec. Inc.*, 582 F.Supp. 485, 502 (S.D.N.Y. 1984) ("Under New York law, brokers maintain fiduciary duties to their customers."). The situation is akin to a customer granting trading discretion to a stockbroker, which is a recognized basis for imposing fiduciary duties on the stockbroker. *See Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 481 (E.D.N.Y. 1998), aff'd, 205 F.3d 1327 (2d Cir. 2000).

Shrem's assumption of fiduciary obligations included the duty to disclose all relevant facts to his principal, *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994) ("A broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it"), and the obligation not act for his own benefit. *See Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1082, 1088 (S.D.N.Y. 1985) ("We hold only that if the defendants purchased the 400 silver receipts predominantly for their own economic benefit they will have breached their fiduciary duty"). It also required Shrem to provide all information to WCF (his principal) regarding information relevant to the affairs entrusted to him. *See Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937 (S.D.N.Y. 1979); Restatement (Second) of Agency § 381 (1958).

Shrem breached these fiduciary obligations in myriad ways. Shrem withheld critical information from his principals, such as the price paid per bitcoin and the amount he spent on each tranche of bitcoin. Critically, his accounting (such as it was) failed to account for nearly 5,000 bitcoin, that he should have acquired on WCF's behalf, and for which he received money. And most egregiously, Shrem used money from WCF to buy bitcoin for himself, defrauding his principals of 5,000 bitcoin. Just weeks after WCF sent Shrem an initial tranche of $250,000

-14-

between September and October 2012, Shrem deposited 5,000 bitcoin into his own personal
address, clearly prioritizing his own interests over those of his principals.

In summary, by virtue of taking WCF's money and exercising complete discretion over
the use of that money to secure bitcoin, Shrem became WCF's fiduciary. *See, e.g., Bd. of
Managers*, 193 A.D.2d at 325. Shrem undoubtedly betrayed the confidence that WCF reposed in
him. He took $750,000 from WCF and promised to secure it bitcoin at "the best price" with that
money, yet kept approximately $61,000 to purchase 5,000 bitcoin for his own account.

### 2.    Shrem Committed Fraud by Convincing WCF to Entrust Him with Funds that He Used to Buy Bitcoin for Himself

Under New York law a fraud cause of action requires "a misrepresentation or a material
omission of fact which was false and known to be false by the defendant, made for the purpose
of inducing the other party to rely upon it, justifiable reliance of the other party on the
misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*,
27 N.Y.3d 817, 827 (2016) (citation and quotations omitted).

Here, Shrem committed fraud by falsely representing that he wanted to help WCF (rather
than stating honestly that he wanted to acquire bitcoin for himself with WCF's money), and that
he would secure bitcoin for WCF at the "best price." *See In re Argo Comm'ns Corp.*, 134 B.R.
776, 791-92 (Bankr. S.D.N.Y. 1991) (fraud cause of action stated where defendant "fraudulently
misrepresented that it would act in Argo's best interests"). Shrem's misrepresentation induced
WCF to entrust him with the money to make the bitcoin purchases and it suffered injury when he
instead misappropriated a portion of the funds to buy bitcoin for himself.

### 3.    WCF's Claims are Timely

Both the fraud and breach of fiduciary duty causes of action are subject to a six-year
statute of limitations. The limitations period applicable to fraud claims, N.Y. C.P.L.R. § 213, is

also applicable to the breach of fiduciary duty claim here because the gravamen of the complaint sounds in fraud. *See Netzer v. Continuity Graphic Associates, Inc.*, 963 F. Supp. 1308, 1322 (S.D.N.Y. 1997) ("Claims for breach of fiduciary duty are subject to either a three year or six year statute of limitations, depending on whether 'the gravamen of the complaint' more closely resembles an action to injury to property (governed by a three year limitations period) or an action for fraud (governed by the six year/two year limitations period).").

WCF sent Shrem money to purchase bitcoin beginning on September 12, 2012 and WCF discovered the improper accounting in early 2013. This action is therefore timely filed.

### 4.    WCF's is Entitled to 5,000 Bitcoin

Longstanding precedent entitles the victim of a breach of a fiduciary duty to what was unlawfully acquired by the fiduciary. *See Lundy v. Murtagh*, 141 N.Y.S.2d 247 (N.Y. Sup. Ct. 1955) ("It is well established that one who has profited by a breach of a fiduciary duty will be regarded as a constructive trustee of what has been improperly acquired").

A constructive trust is a legal fiction that makes the wrongdoer a trustee of the plaintiff's assets until the wrongdoer transfers them back to the plaintiff. In general, it may be imposed when a party claiming entitlement can show: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *In Re Koreag*, 961 F.2d 341, 352 (2d Cir. 1992); *Brand v. Brand*, 811 F.2d 74, 77 (2d Cir.1987) (noting flexibility in application). All of those requirements are satisfied here. WCF and Shrem had a confidential relationship in which WCF entrusted substantial assets to Shrem; Shrem promised to buy bitcoin on WCF's behalf at the best possible price; WCF transferred $750,000 to Shrem in reliance on that promise; and Shrem was unjustly enriched to the tune of

-16-

5,000 bitcoin by violating the trust placed in him and purchasing bitcoin for his own account with WCF's money.

Alternatively, an award of damages denominated in bitcoin is appropriate under New York Judiciary Law section 27, which provides:

> In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree.

Under controlling caselaw in this district, bitcoin is "money." *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin clearly qualifies as "money" or "funds" under these plain meaning definitions"); *United States v. Murgio*, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (collecting cases holding that bitcoin is money for purposes of federal money laundering and money transmitter statutes). Shrem's obligation to WCF was denominated in bitcoin. Thus, a judgment entered as 5,000 bitcoin is proper. *See also Mitsui & Co. v. Oceantrawl Corp.*, 906 F. Supp. 202 (S.D.N.Y. 1995) ("Entry of judgment in the currency of the parties' transactions accords with principles of fairness and with the goal of making injured parties whole because it provides them with payment in the currency for which they bargained"); *Liberty Media Corp. v. Vivendi Universal. S.A.*, 2013 WL 105776, at *2-3 (S.D.N.Y. Jan. 9, 2013) (same); *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1328 (7th Cir. 1992) ("The court should enter the judgment in the currency the parties themselves selected for their dealings, the currency in which the loss is felt.").

### D. Any Uncertainty is Resolved by Records that Xapo, Coinbase, Bittrex, and Poloniex are Required to Maintain by Federal Law

While the 3,999 bitcoin passed through two as-of-yet unidentified addresses before landing at Xapo and Coinbase, any resulting uncertainty will be resolved by records that Xapo

and Coinbase are required to maintain under federal law, 31 U.S.C. § 5311 *et seq.*; 31 C.F.R. §

1010.220 *et seq.,* as well as records they are required to maintain under New York State Virtual

Currency Regulations as New York State Bitlicense companies. *See* 23 N.Y.C.R.R. § 200.1 *et*

*seq*. The same is true with Bittrex and Poloniex (and other garnishees on which a levy might be

served); while there is some uncertainty whether any of these institutions currently hold assets on

Shrem's behalf, that uncertainty will be resolved once an attachment order is served on their

representatives in New York and they return a Garnishee's statement pursuant to N.Y. C.P.L.R.

section 6219. *Cf. People v. Sousa*, 18 Cal.App.4th 549, 557, 22 Cal.Rptr.2d 264, 269 (1993).

If this Court decides to issue an attachment order but the records of these Garnishees

show they hold no assets in Shrem's name (or in which he has an interest), then the attachment

order becomes a nullity as to them. If in the unlikely event that Shrem's garnishees collectively

hold more than 5,000 bitcoin worth of Shrem's personal property, the Court may issue an order

after receipt of garnishee's statements reducing the pro rata share of attached assets accordingly.

### E.   The Mechanism of Attachment

Pursuant to New York law, prejudgment attachment of personal property may be

accomplished through one of two mechanisms. Under N.Y. C.P.L.R. section 6214(a), attachment

may be accomplished through service by the Sheriff of an order of attachment upon the

defendant, or any garnishee with possession or custody of defendant's property. The service of

the order of attachment thereafter prohibits the defendant (or any garnishee) from transferring the

attached property. Under N.Y. C.P.L.R. section 6215, attachment may also be accomplished by

the sheriff taking actual possession of attached property upon a plaintiff's direction and provision

of indemnity.

The most logical mechanism here is probably the former — an order requiring Xapo, Coinbase, Bittrex, and Poloniex to freeze any bitcoin in Shrem's name, together with an attachment order served on Shrem himself. However, it may be appropriate to order the exchanges and Shrem to transfer bitcoin held in Shrem's name to the U.S. Marshall's Service given that there is a competing unsatisfied liability in the amount of $950,000 to the United States Government. *C.f.* 28 U.S.C. § 3102.

## V.  CONCLUSION

For all the foregoing reasons, WCF respectfully submits that the requested prejudgment attachment order issue.

DATED: September 11, 2018          Respectfully submitted,

By: _____

Tyler Meade
THE MEADE FIRM p.c.
California Office:
    12 Funston Ave., Suite A
    San Francisco, CA  94129
New York Office:
    111 Broadway, Suite 2002
    New York, NY  10006
Telephone: (415) 724-9600
tyler@meadefirm.com

Attorneys for Plaintiff