# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

WINKLEVOSS CAPITAL FUND, LLC,

        Plaintiff,

        v.

CHARLES SHREM,

        Defendant.

Case No.

**AFFIDAVIT OF CAMERON WINKLEVOSS IN SUPPORT OF EX PARTE APPLICATION FOR PREJUDGMENT ATTACHMENT**

**18 CV 8250**

I, Cameron Winklevoss, hereby declare as follows:

1.      I am a principal of Winklevoss Capital Fund ("WCF"), a family investment fund that I founded in 2012 together with my twin brother Tyler Winklevoss. WCF is invested in a diverse portfolio, with an emphasis on technology startups and virtual currency.[1] Except as to matters stated on information and belief, I have personal knowledge of the information referenced herein and could competently testify as to its truth if called to do so. As to matters stated on information and belief, I am informed and believe them to be true.

2.      Beginning around mid-2012, my brother and I began to research the virtual currency space, namely Bitcoin.[2] We were intrigued by the potential of a decentralized, peer-to-peer currency as well as the innovative promise of blockchain technology. At the time, the industry was in its infancy. Many of the businesses in the Bitcoin ecosystem were

---

[1] Virtual currency is used throughout this document to refer to the entire ecosystem of virtual commodities and other asset types that are digital representations of value that function as a medium of exchange, a unit of account, and/or a store of value.

[2] By common convention, Bitcoin with a capital "B" typically refers to the Bitcoin Network as a whole, whereas bitcoin with a lowercase "b" refers to the virtual commodity of the Bitcoin Network. This naming convention is used throughout this document.

undercapitalized and staffed by novices, with little background in business or finance. Tyler and I saw enormous investment potential if we could help nurture Bitcoin into adulthood.

3.      Two of WCF's first investments in the virtual currency space involved Charles Shrem, who my brother and I first met in 2012. Shrem was one of Bitcoin's earliest adopters and, from what he explained to us, saw himself as a kind of Bitcoin evangelist. He was a founding member of the Bitcoin Foundation and was well connected with many of the earliest Bitcoin pioneers. Shrem was also the founder and CEO of BitInstant, LLC ("BitInstant"), a New York company that was one of the first to provide services to facilitate the purchase of bitcoin by consumers until it ceased operations in or before July 2013. He was subsequently arrested and plead guilty to felony money laundering charges for facilitating financial transactions with known drug dealers. *USA v. Faiella, et al.*, S.D.N.Y. Case No. 14-CR-243, Dkt. No. 61 (Rakoff, J.).

4.      WCF invested in BitInstant in 2012, but later decided that Shrem and BitInstant were bad for the Bitcoin ecosystem. In January 2014, just a few days before Shrem was arrested by federal agents, WCF declined to permit a further investment in BitInstant, a lifeline that the company needed to stay afloat. My brother and I believed this was proper, even though it meant there was no chance that WCF would recoup its original investment in BitInstant. The company was poorly run, and there was little apparent separation between Shrem's personal affairs and BitInstant.

5.      In late 2012, well before we learned of Shrem's shortcomings, Tyler and I decided that WCF should acquire bitcoin as an investment. Because the Bitcoin ecosystem was not mature at the time, it was difficult to acquire bitcoin, especially in the large quantities we sought. Only a few exchanges existed where investors could reliably buy and sell bitcoin. Most

of the volume was driven by small consumer purchases of just a few hundred dollars. A large acquisition like we sought was sure to drive up the price. Moreover, we wanted to keep WCF's investment activity confidential because we did not want to alert the market that WCF was making a large purchase, thereby managing and minimizing market impact.

6.      As Shrem was courting our investment in BitInstant, he offered to help WCF acquire bitcoin, making clear that he would do so at the best possible price and take no commission or other compensation. We understood that Shrem had many connections in the Bitcoin ecosystem, and as a consequence we believed that if we entrusted him to secure bitcoin on our behalf, we could avoid impacting the market — by keeping WCF's investment activity confidential — namely, that WCF was accumulating a large amount of bitcoin. We understood Shrem would benefit by helping us because our involvement with BitInstant would raise the profile of his company and the profile of Bitcoin at large.

7.      Our arrangement is memorialized in several emails that I exchanged with Shrem between September 2012 and April 2013.

8.      For example, on September 11, 2012 — shortly before WCF wired its first money to Shrem (care of BitInstant) to purchase bitcoin — Shrem explicitly promised me that he would secure bitcoin at "the best price." The following day, Shrem again reiterated that he would "buy the most we can get" when I told him we intended to send $50,000 for an initial purchase. A few months later, when I emailed Shrem at the end of December 2012, he again promised that he would buy bitcoin for WCF at the lowest price. True and correct copies of these emails are attached hereto as Exhibits A and B, respectively.

9.      Relying on Shrem's expertise, his connections, and his promise to secure bitcoin for us the best price, WCF sent Shrem a total of $750,000 between September 2012 and February

-3-

2013. Shrem was given total discretion over where to secure the bitcoin and at what price to buy. We placed total faith and confidence in Shrem to act in our best interest and to do as he promised.

10.     WCF sent money to BitInstant in the following installments: (a) $50,000 on September 12, 2012; (b) $50,000 on September 24, 2012 (in two blocks of $25,000); (c) $50,000 on September 28, 2012; (d) $50,000 on October 3, 2012; (e) $50,000 on October 10, 2012; (f) $100,000 on December 28, 2012; (g) $200,000 on January 29, 2013; and (h) $200,000 on February 6, 2013.

11.     In exchange for $750,000, WCF received only 39,876.34 bitcoin. Unfortunately, this was short of the amount of bitcoin WCF should have received. To this day, Shrem has never provided any explanation for a shortfall of approximately 5,000 bitcoin that he should have sent WCF between September and October 2012.

12.     Before the first $50,000 was sent to Shrem in September 2012, Shrem promised to send WCF an "overall report once the [bitcoin] are bought, so you can see the average price." That same month, Shrem gave more specific representations about an accounting — he told me on September 21, 2012 via email that "I set up a Google Doc of every time you wire me, how many BTC I buy, and at what price, so we can keep track of the metrics." A true and correct copy of these emails is attached hereto as Exhibits A and C.

13.     Shrem did not share a spreadsheet until January 31, 2013 — more than four months after he initially promised to set one up. When I reviewed the spreadsheet, I saw that a total of only 8,500 bitcoin — a fraction of what Shrem was supposed to have purchased for WCF — was listed. A true and correct copy of an email from me to Shrem noting the shortfall, as well as Shrem's response, is attached hereto as Exhibit D.

14.     I confronted Shrem about this lack of a proper accounting. Shrem responded that the spreadsheet only reflected transactions sent to one of four Bitcoin addresses controlled by WCF, and that he would prepare additional spreadsheets for the other three addresses. He admitted, "The accounting for the other 3 is not as good as this one, so over the weekend I will compile it all into a single sheet."

15.     I clarified the same day that we expected, as a proper accounting, (a) the amount of bitcoin purchased, (b) the date they were purchased, (c) the cost basis of each purchase, and (d) the Bitcoin address where they were sent. We asked for all of this information on one spreadsheet.

16.     In multiple emails and phone calls over the following weeks, Tyler and I repeatedly asked Shrem to produce a proper accounting. I wrote to Shrem on February 19:

> I have been asking for [an accounting] for weeks (if not months). I have been patient and at this point it's getting a bit absurd. . . I will have no choice but to take measures to get this done if you don't start giving me a firm answer as to when you will complete this work. I need the cost basis for every coin you have purchased for me, and by my current back of the envelope calculations I am short 1000s of coins that should have been bought and sent to me over the past 5-6 months. I don't take this lightly.

A true and correct copy of this email is attached hereto as Exhibit E.

17.     At first, Shrem responded that he had been "updating" the spreadsheet, and he had added a tab called "Older Buys". On February 20, 2013, Shrem sent me an email entitled "Spreadsheet" in which he wrote,

> Hey,
> See the sheet, I've updated and merged.  There is still some earlier data missing, but I'm filling it in as I find it.
> Thanks,
> Charlie

A true and correct copy of that email is attached hereto as Exhibit F.

-5-

18.     Two days later — and months after I had asked for a proper accounting — Shrem

sent me an email asking for the amount that WCF had wired him in September and October

2012. Shrem claimed he was missing this information because Bitinstant's Citibank account had

been shut down and he couldn't access the banking records. I promptly had our accountant send

Shrem these figures within about an hour. Shrem later asked for similar figures between October

2012 and February 2013, which I am informed and believe our accountant also sent. A true and

correct copy of this email is attached as Exhibit G.

19.     On February 25, 2013 — fed up with Shrem's lack of transparency and

inadequate accounting — Tyler and I engaged Richard Paukner & Associates, LLC, an

accounting firm, to audit the data provided by Shrem and to meet with Shrem at his offices. I am

informed and believe that Matt Gruchevsky, an associate at Paukner, met with Shrem at the

BitInstant offices two days later, on February 27, 2013, in an effort to get a full and accurate

accounting.

20.     After the meeting, Shrem provided WCF with a spreadsheet with numerous

transactions, which is the most complete accounting he has been able to provide. The spreadsheet

is attached hereto as Exhibit H.

21.     The spreadsheet is woefully inadequate. It lacks basic details that any proper

accounting should include. For the eleven reported bitcoin purchases Shrem made on WCF's

behalf during the period from September 12 to October 10, 2012, Shrem did not include (a) a

starting balance in our account, (b) the price paid per bitcoin (except for two transactions on 9/27

and 10/10), (c) the ending balance in our account, or (d) the amount in U.S. dollars spent on

bitcoin.

22.     Shrem only provided the number of bitcoin purchased for the initial eleven transactions between September 12 and October 10, 2012, omitting the price paid per bitcoin and our account balance.

23.     The spreadsheet also makes basic arithmetic errors. For instance, Shrem's "accounting" notes that we had a balance of $43,753.55 on October 10. Between October 10 and December 28, 2012, Shrem reported no transactions on our behalf. On December 28, 2012, WCF wired BitInstant an additional $100,000 to purchase bitcoin. Thus, the balance on December 28, 2012 should have read $143,753.55, but Shrem noted only a balance of $100,000 on December 28, 2012 (mislabeled 2013 on his spreadsheet).

24.     Comparing the number of bitcoin he purchased with the price of bitcoin on the day he sent us those amounts, my rough calculations indicated that he owed us thousands of bitcoin.

25.     A subsequent audit by our accountant, Matthew Gruchevsky of, confirmed my suspicions. By comparing the number of bitcoin sent to us with the weighted average price of bitcoin on the days the bitcoin was sent, Gruchevsky concluded that Shrem count not account for approximately $61,000 that we sent to him, which would have purchased approximately 5,000 bitcoin at the time.

26.     Confirming our understanding that Shrem was not entitled to a commission on these bitcoin transactions, Shrem's spreadsheet does not include any adjustments for a commission or broker's fee paid to Shrem.

27.     Shrem has never explained the missing bitcoin as a commission to which he was entitled, or an expenditure on brokers' fees.

28.     In an effort to recover our missing bitcoin, WCF engaged the services of Elliptic, Inc. ("Elliptic"), a bitcoin forensic investigation firm located in London, England in July 2017.

29.     A report produced by Elliptic, based on information provided by WCF, publicly available information, and Elliptic's proprietary information, indicated that Shrem received 5,000 bitcoin in December 2012 — just weeks after Shrem could not account for 5,000 bitcoin that rightfully belonged to us.

30.     WCF does not believe that Shrem has any counterclaim to assert.

31.     All of my contact with Shrem during the time period when he purchased bitcoin on behalf of WCF, as well as our initial conversations about Bitcoin, and investing in BitInstant were in New York. BitInstant, where WCF wired money for Shrem to acquire bitcoin on our behalf, was based in New York. My brother Tyler and I live in New York, as did Charlie Shrem until he went to federal prison. All of the relevant underlying events alleged herein took place in either Manhattan or Brooklyn.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct to the best of my knowledge.

Executed on September 10, 2018 in New York, New York.

_____
Cameron Winklevoss