UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINKLEVOSS CAPITAL FUND, LLC,<br><br>            Plaintiff,<br><br>   v.<br><br>CHARLES SHREM,<br><br>            Defendant. | Case No.  18-cv-8250 (JSR)<br><br>**REPLY IN SUPPORT OF MOTION TO CONFIRM ATTACHMENT ORDER** |

Tyler Meade
THE MEADE FIRM p.c.
California Office:
    12 Funston Ave., Suite A
    San Francisco, CA  94129
New York Office:
    111 Broadway, Suite 2002
    New York, NY  10006
Telephone: (415) 724-9600
tyler@meadefirm.com

*Attorneys for Plaintiff*

## TABLE OF AUTHORITIES

**CASES**

*Arzu v. Arzu*, 190 A.D.2d 88 (1993) ............................................................................................. 9
*AT&T Corp. v. Syniverse Tech., Inc.*, 2014 WL 4412392 (S.D.N.Y. Sept. 8, 2014) ..................... 5
*Barrett v. Freifeld*, 883 N.Y.S. 2d 305 (2009) ............................................................................. 10
*Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*, 2018 WL 1402239 (E.D.N.Y. Mar. 4, 2018) ................................................................................................................................. 8
*Ciccone v. Hersh*, 530 F. Supp. 2d 574 (S.D.N.Y. 2008) ............................................................ 11
*DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308 (E.D.N.Y. 2009) ....................... 8
*Elbex Video Kabushiki Kaisha v. Taiwan Regular Elecs. Co.*, 1996 WL 87278 (S.D.N.Y. Jan. 25, 1996) ............................................................................................................................................. 5
*Executive House Realty v. Hagen*, 438 N.Y.S.2d 174 (N.Y. Sup. Ct. 1981). ............................... 8
*Havoco of Amer. Ltd. v. Hill*, 790 So.2d 1018 (2001) ................................................................... 6
*Howell v. Freifeld*, 631 F. Supp. 1222 (S.D.N.Y. 1986) ............................................................. 10
*JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development and Trade Services, Inc.*, 306 F. Supp. 2d 482 (S.D.N.Y. 2003) ............................................................................................ 9
*Monteleone v. Leverage Grp.*, No. CV-08-1986(CPS)(SMG), 2008 WL 4541124 (E.D.N.Y. Oct. 7, 2008) ........................................................................................................................................... 9
*Plaintiff Funding Holding, Inc. v. Carrera*, No. 17-CV-257(ARR)(ST), 2017 WL 7411183 (E.D.N.Y. Feb. 6, 2017) ................................................................................................................. 7
*Prabir v. Bukhara Indian Cuisine, Inc.*, 2018 WL 2709231 (S.D.N.Y. May 17, 2018) ................ 9
*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999) .................................................. 10
*Saul v. Cahan*, 61 N.Y.S. 3d 265 (2017) ..................................................................................... 11
*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ...................... 12
*TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575 (S.D.N.Y. 2012) ......................................... 6
*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) ........................................................... 10
*United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006) ..................................................................... 9
*United States v. Wolfson*, 642 F. 3d 293 (2d Cir. 2011) ............................................................. 10
*VNB New York, LLC v. Rapaport*, 50 Misc. 3d 1213(A), 29 N.Y.S.3d 850 (N.Y. Sup. 2016) ....... 7

**STATUTES**

F.R.C.P. 3 ..................................................................................................................................... 11
Fl. Const. Art. X, sec. 4(a) .............................................................................................................. 6
N.Y. C.P.L.R. § 203(b)(4) ............................................................................................................ 11
N.Y. C.P.L.R. § 203(c) ................................................................................................................. 12
N.Y. C.P.L.R. § 6201 ..................................................................................................................... 4
N.Y. C.P.L.R. § 6201(1) ................................................................................................................ 5
N.Y. C.P.L.R. § 6201(3) ............................................................................................................ 5, 7

I.  **Introduction**

Shrem fails to present one iota of evidence that rebuts WCF's central claim of wrongdoing. Shrem makes absolutely no showing to contest that (1) WCF entrusted him with $750,000 to purchase bitcoin on its behalf; (2) he was given full and complete discretion over where and when to purchase bitcoin with this money; (3) he has failed to account for $61,000 of this money entrusted to him in September and October 2012; (4) this $61,000 would have purchased 5,000 bitcoin at the time; and (5) he still owes WCF 5,000 bitcoin. These facts form the core of WCF's entitlement to relief. While Shrem has presented (untested) evidence that the *specific* 5,000 bitcoin sent to his blockchain address on December 31, 2012 was not acquired with WCF's stolen funds, his meager showing does not diminish WCF's entitlement to 5,000 bitcoin that is unaccounted for and remains missing.[1]

Where did WCF's 5,000 bitcoin go? WCF has introduced further uncontested evidence that Shrem has amassed a small fortune since leaving prison. In Shrem's own telling, it is a rags-to-riches tale. He spent six months as a dishwasher until the end of 2016 and thereafter worked a variety of unspecified jobs that allowed him "to accumulate funds and restore [himself] financially." Dkt. No. 45-1 (Shrem Decl., ¶ 8). In total, these "jobs" enriched Shrem by at least $12 million, Dkt. No. 29 (Mason Decl., ¶¶ 2-3, Exs. A-B), and afforded him the luxury to spend $50,000 per month (pre-tax) on living expenses, Dkt. No. 46.[2] One can credit Shrem's Horatio Alger explanation, or perhaps conclude that he profited off the significant appreciation of a

---

[1] WCF has always acknowledged a degree of uncertainty over the provenance of the December 31, 2012 transactions involving 5,000 bitcoin. *See* Dkt. No. 25 (Robinson Decl., ¶¶ 41-48).

[2] Among Shrem's numerous apparent concessions, he does not contest WCF's evidence that he acquired $4 million in real estate *in cash*, and he has not disclaimed a recent twitter statement where he explains that only 33% of his assets are in real estate. Dkt. Nos. 29-1 (tweet) and 29-2 (real estate holdings); Dkt. No. 45-1 (Shrem Decl.).

1

hidden trove of WCF's bitcoin that he stashed away years ago. Regardless, he needs to return WCF's bitcoin.

The Court should confirm the Order of Attachment. WCF is likely to prevail on the merits as Shrem has done nothing to dispute WCF's evidence that he still owes WCF 5,000 bitcoin. Attachment is proper under two independent grounds stated in N.Y. C.P.L.R. § 6201 — that Shrem is a nondomiciliary and that he has evidenced an attempt to frustrate his creditors and any judgment. Shrem's additional arguments fail for the reasons specified below.

## II.    Argument

### A. WCF Is Likely to Prevail on the Merits, as This Case Does Not Hinge on the Ownership of the 5,000 Bitcoin Transferred in December 2012

Between September and October 2012, WCF sent Shrem $250,000 to purchase bitcoin on its behalf. Dkt. No. 26 (Winklevoss Decl., ¶¶ 9-10). Shrem was only ever able to account for $189,000. Dtk. No. 27 (Gruchevsky Decl., ¶ 9). The missing $61,000 would have purchased 5,000 bitcoin at the time. *Id.* Shrem does not contest these basic facts. Dkt. No. 45-1. Shrem only argues that WCF has apparently identified the wrong 5,000 bitcoin which Shrem stole. But the ownership of the 5,000 bitcoin transferred in December 2012 does not change the contours of the case. The (uncontested) fact remains that Shrem cannot account for 5,000 bitcoin owed to WCF.

Shrem's attempt to suggest that WCF has not established fraudulent intent in 2012 is without merit. Shrem attempts to cabin WCF's fraud allegations into misstatements about and failure to perform (1) his promise to buy bitcoin at the best price, and (2) his promise to provide an accounting. But Shrem's fraud was promising to buy bitcoin *and instead pocketing the money to buy bitcoin for himself*. WCF was induced to send money to Shrem based on his representations that he would buy bitcoin for WCF. In reliance on that promise, WCF sent money. Shrem's fraud was taking WCF's money and buying bitcoin for himself.

2

Shrem's fraudulent intent is evidenced not only in his misleading statements to Cameron and Tyler Winklevoss before they sent him any money, but also in his repeated pattern of misleading statements after the fact that were meant to obscure his diversion of their funds. Indeed, in December of 2012, he continued the ruse of promising that he would acquire bitcoin for WCF at the best price, knowing that he had already pocketed $61,000 worth of bitcoin for himself. Dkt. No. 26, ¶ 8, Ex. B.  As explained below when addressing Shrem's statute of limitations argument, this fraud was perfected in 2013, once an accounting was demanded and Shrem refused to turn over the funds. *Cf. generally* section II.B.2 (discussing fraudulent intent).

### B. WCF Has Adequately Established the Statutory Grounds for Attachment Under Both N.Y. C.P.L.R. §§ 6201(1) and (3)

#### 1. Attachment is proper under N.Y. C.P.L.R. § 6201(1), as Shrem failed to oppose this ground for attachment and is a nondomiciliary likely to lack sufficient assets to satisfy a judgment and to hide or dispose of the rest

Shrem's opposition fails to mention WCF's request for attachment under N.Y. C.P.L.R. § 6201(1). Instead, his opposition only cites N.Y. C.P.L.R. § 6201(3) and case law relevant to that provision. *See, e.g.*, Opposition to Motion to Confirm Prejudgment Attachment Order ("Opp"), Dkt. No. 45, at pp. 5, 8, 11. This silence on one of WCF's two alternative grounds for attachment constitutes a waiver. *AT&T Corp. v. Syniverse Tech., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (holding that plaintiff's failure to respond to an argument in the opposition brief conceded the argument); *Elbex Video Kabushiki Kaisha v. Taiwan Regular Elecs. Co.*, 1996 WL 87278, at *4 (S.D.N.Y. Jan. 25, 1996) (similar).

Even if Shrem had opposed WCF's request for attachment on the grounds of N.Y. C.P.L.R. § 6201(1), he would have failed. WCF has satisfied the express requirements of N.Y. C.P.L.R. § 6201(1) (that Shrem be a nondomiciliary) and has further established that Shrem is likely to lack sufficient assets in New York to satisfy an adverse judgment — a key component

3

of justifying attachment under NY. C.P.L.R. § 6201(1). *See, e.g.*, *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (the key question under 6201(1) is whether the defendant "has assets within the State that could satisfy a judgment and whether petitioner's fear that the judgment will not be satisfied is reasonable") (citation and internal quotation marks omitted).

The responses from the various garnishees support the position that WCF's fear is "reasonable" that it would not be able to recover its assets post-judgment. *TAGC Mgmt.*, 842 F. Supp. 2d at 587; Dkt. No. 31-1 to 31-4 (Meade Decl.). While WCF served nearly thirty leading financial and cryptocurrency firms in New York with the Order of Attachment, WCF levied less than $10. Dkt Nos. 34, 35, 37. Most of Shrem's assets therefore appear to be (literally) in the cloud in undisclosed crypto currency wallets.

Shrem's only assets that a creditor might reach — his real estate holdings in Florida — are largely beyond grasp. Florida's constitution provides its residents with one of the most defendant-friendly homesteader protections in the nation. Shrem's $2.25 million primary residence in Sarasota, Florida — which accounts for over half his real estate holdings, Dkt. No. 29-2 — is "exempt from the forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon. . . ." Fl. Const. Art. X, sec. 4(a). There are few exceptions to the protection. *See Havoco of Amer. Ltd. v. Hill*, 790 So.2d 1018, 1030 (2001) ("a homestead acquired by a debtor with the specific intent to hinder, delay, or defraud creditors is not excepted from the protection of article X, section 4").

Shrem also is likely to hide or dispose of whatever assets might still be within WCF's reach. The evidence of such a risk includes that Shrem failed to return 5,000 bitcoin to the plaintiff and has been convicted of relevant criminal activity. WCF's failure to garnish any assets

4

of consequence evidences Shrem's intent to structure his affairs to obstruct collection efforts. Shrem acknowledges that he is on an installment plan to satisfy his restitution order of $950,000, Dkt. No. 45-1 (Shrem Decl., ¶ 9), but fails to explain why an installment plan is necessary when he has more than enough assets to immediately satisfy the entire amount. This strongly suggests Shrem has misled the Government about his assets and ability to pay.

It is clear that "drastic action is required for security purposes" here. *Plaintiff Funding Holding, Inc. v. Carrera*, No. 17-CV-257(ARR)(ST), 2017 WL 7411183, at *3 (E.D.N.Y. Feb. 6, 2017).

> **2. Attachment Is Proper As Well Under Section 6201(3), As Shrem Has Evidenced a Fraudulent Intent to Frustrate His Creditors and to Frustrate the Enforcement of a Judgment in This Case**

While neglecting to address section 6201(1), Shrem does argue in his opposition that WCF failed to demonstrate that he "has concealed or is about to conceal property with the intent to defraud creditors or to frustrate the enforcement of a judgment" as would be required for attachment pursuant to N.Y. C.P.L.R. § 6201(3). But Shrem is wrong on both the facts and the law. WCF has provided "a plethora of evidence of fraudulent intent" on Shrem's part, *Plaintiff Funding Holding*, 2017 WL 7411183, at *5 (internal citation omitted), and an attachment is "warranted pursuant to CPLR 6201(3)," *VNB New York, LLC v. Rapaport*, 50 Misc. 3d 1213(A), 29 N.Y.S.3d 850 (N.Y. Sup. 2016).

The fact that Shrem has evidenced an intent to frustrate his creditors is clear from his failure to fully satisfy his debt to the government while insulating major assets under Florida law. The fact that WCF's levy efforts have turned up nothing of consequence within New York is further indication of Shrem's attempts to insulate himself from judgment.

5

Shrem asserts that "WCF's own allegations against Shrem are not sufficient grounds for prejudgment attachment as a matter of law." Opp. at p. 10. To support this argument, he cites *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 322 (E.D.N.Y. 2009), and *Executive House Realty v. Hagen*, 438 N.Y.S.2d 174, 177 (N.Y. Sup. Ct. 1981). While it is true that having meritorious causes of action is not in and of itself sufficient to support prejudgment attachment, those cases do not hold that the defendant's acts toward the plaintiff underlying the dispute are irrelevant to the attachment analysis under N.Y. C.P.L.R. § 6201(3).

Because "'fraudulent intent is rarely susceptible to direct proof,' district courts in the Second Circuit have examined whether allegedly suspicious transactions exhibit 'badges of fraud' that give rise to a sufficient inference of intent." *DLJ Mortg.*, 594 F. Supp. 2d at 320. These "badges of fraud" include:

> (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*, 2018 WL 1402239, at *6 (E.D.N.Y. Mar. 4, 2018) (internal citation omitted).

All of these "badges of fraud" are present here, and a plaintiff need not establish all of the possible badges of fraud must be present for courts to find fraudulent intent. *DLJ Mortg. Capital*, 594 F. Supp. 2d at 325. Shrem's failure to account for the missing 5,000 bitcoin in the underlying dispute, taken together with his move to Florida, his lack of explanation for his sudden rise to wealth since leaving prison beyond a conclusory assertion that "jobs" allowed him to "restore [himself] financially," Dkt. No. 45-1, his substantial investment in cryptocurrency, his

6

retention of assets instead of satisfying his debt to the government, and WCF's failed efforts to garnish any assets in New York all speak to his intent to frustrate both creditors and judgment.

Moreover, "Courts should also consider whether the transaction was conducted in a clandestine manner." *Prabir v. Bukhara Indian Cuisine, Inc.*, 2018 WL 2709231, at *3 (S.D.N.Y. May 17, 2018). The "[d]efendants' evasiveness throughout the [attachment] proceedings, their inability to account for profits from a property sale and lack of any bank records showing where the money went, is more than sufficient to support a finding that defendants had actual intent to frustrate enforcement of a judgment that could result from this action." *Id.* at 4. Shrem continues to fail to explain what happened to the 5,000 missing bitcoin and now he further fails to explain his sudden accumulation of wealth.

In *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development and Trade Services, Inc.*, 306 F. Supp. 2d 482, 487-88 (S.D.N.Y. 2003), the court found fraudulent intent where "defendants had a hazy memory of disbursement of the proceeds from the sale of their properties and were unable to explain fully where all the proceeds went and why." *Prabir*, 2018 WL 2709231, at *4; *see also Monteleone v. Leverage Grp.*, No. CV-08-1986(CPS)(SMG), 2008 WL 4541124, at *9 (E.D.N.Y. Oct. 7, 2008) (similar); *Mineola Ford Sales v. Rapp*, 242 A.D.2d 371, 372 (1997) (similar); *Arzu v. Arzu*, 190 A.D.2d 88, 92 (1993) (similar). That logic applies forcefully here.

### C. Shrem's Other Arguments Are Unpersuasive[3]

#### 1. Shrem Was a Fiduciary

It is blackletter law that an agent with discretionary authority over a principal's monies is a fiduciary with respect to management of the funds. *United States v. Skelly*, 442 F.3d 94, 98 (2d

---

[3] Because the parties agree that WCF's claims for a constructive trust and an accounting turn on its claims of breach of fiduciary duty and fraud, WCF will not separately address these claims in the reply.

Cir. 2006). Shrem had such control over WCF's funds, his discretion circumscribed in only one respect: use the entirety of the funds to purchase Bitcoin at the best price. Plainly, a fiduciary duty existed. *Id.* (a fiduciary "relationship exists in situations in which a broker has discretionary authority over the customer's account"); *see also United States v. Wolfson*, 642 F. 3d 293, 295 (2d Cir. 2011); *Howell v. Freifeld*, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986). Even where a manager's fiduciary duties are narrowed, such as where the broker is given the task to execute trades for a non-discretionary account maintained by a sophisticated investor, a manager is obligated at least to the "narrow task of consummating the transaction requested." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999).

Shrem, of course, was given much more authority than "the narrow task of consummating the transaction[s] requested." He was given complete authority over $750,000 of WCF's money. WCF cabined this authority in only one respect, requiring Shrem to purchase bitcoin at the best price. WCF otherwise relied entirely on Shrem to manage its funds and maximize bitcoin purchased. The cryptocurrency context may be new, but the fiduciary concept is not. *See United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir. 1991) ("'At the heart of the fiduciary relationship lies reliance, and de facto control and dominance'").[4]

Shrem disclaims a fiduciary duty for three reasons: (i) there was no contract; (ii) he was not a stockbroker; and (iii) the Winklevoss twins are sophisticated businessmen who were able to purchase bitcoin independent of Shrem. None of these arguments is persuasive.

---

[4] *See also* BLACK'S LAW DICTIONARY 564 (5th ed. 1979) (One acts in a fiduciary capacity when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part"); *Restatement (Second) of Agency* § 15 (1958) (stating that agency "is a fiduciary relation" and noting that "if the principal requests another to act for him with respect to a matter, and indicates that the other is to act without further communication and the other consents so to act, the relation of principal and agent exists").

A contract is not needed to establish a fiduciary relationship. *Barrett v. Freifeld*, 883 N.Y.S. 2d 305, 308 (2009). And while Shrem is not a broker, he was given discretionary authority over WCF's funds, a relationship analogous to that of a broker given discretionary authority to invest a client's funds in accordance with the client's investment objectives. The sophistication of the Winklevoss twins is besides the point: they entrusted Shrem to use the money for their benefit and to purchase bitcoin at the best prevailing price.

Shrem's reliance on *Cahan* is misplaced. In *Cahan*, the defendant received a "consulting fee" and acted solely as an *advisor* to the plaintiff, leaving the ultimate decision to purchase the artwork to the plaintiff. *Saul v. Cahan*, 61 N.Y.S. 3d 265, 267 (2017). The relationship lacked the traditional hallmarks commonly associated with a fiduciary relationship, such as discretionary control over funds. *Ciccone* similarly offers no recourse. In *Ciccone*, the Defendant — like in *Cahan* — acted solely as an *advisor* to the Plaintiff. *Ciccone v. Hersh*, 530 F. Supp. 2d 574, 576 (S.D.N.Y. 2008). While the Defendant's investment advice ultimately proved worthless, the actual authority and discretion to make investments remained with the Plaintiff. *Id.* at 576-77 ("The [investments] were nondiscretionary, meaning that Plaintiffs retained full responsibility for trading decisions with respect to the Annuity and only Plaintiffs were authorized to make changes to the Investments"). Shrem's position with respect to WCF, and the authority he retained to make investment decisions on its behalf, is diametrically opposed to those of the Defendant in *Ciccone*. Shrem, not WCF, was responsible for trading decisions.

### 2. The Statute of Limitations Runs from Filing the Complaint, not the Order of Attachment, and in Either Case the Limitations Period Did Not Expire

Shrem also suggests the action is untimely because more than six years passed between the alleged fraud and the date the Order of Attachment was issued on October 2, 2018. In support of citing the October 2, 2018 date, rather than the September 11, 2018 filing of the Complaint

9

(which Shrem concedes would be timely), Shrem cites to N.Y. C.P.L.R. § 203(b)(4). But a federal court sitting in diversity jurisdiction looks to the Federal Rules of Civil Procedure — not underlying state law — to determine when an action commences. Because the Federal Rules provide a clear answer, New York's procedural rules do not govern. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Under F.R.C.P. 3, the action commenced the date it was filed (September 11) and not the date the Order of Attachment was granted (October 2).[5]

In any event, even if October 2, 2018, is somehow found to be the proper date to use for computation of the statute of limitations, WCF's suit is still timely. Shrem's fraud was not perfected until, at the earliest, Shrem first produced an inadequate accounting on January 31, 2013, Dkt. No. 26 (¶ 13, Ex. D), or, more completely, when he refused to surrender the unaccounted for bitcoin, which could not have happened until his meeting with WCF's accountant, Matthew Gruchevsky, on February 27, 2013. Dkt. No. 27 (¶ 5). Even if one looks earlier, it was not until October 10, 2012 that WCF sent the last installment of its first $250,000 to Shrem. It is this $250,000 tranche of funds from which Shrem misappropriated $61,000. Dkt. No. 26 (¶ 10).

### III.   Conclusion

For the foregoing reasons, the Order of Attachment should be confirmed.

DATED: November 7, 2018            Respectfully submitted,


                                   /s/ Tyler Meade

---

[5] In any event, Shrem is also wrong under New York law. N.Y. C.P.L.R. § 203(c) — not subsection (b) — governs the time period used to compute when the claim was interposed against Shrem. *See* N.Y. C.P.L.R. § 203 practice commentaries (noting section 203(c) governs claims filed in New York Supreme Court, where this claim would have been filed if filed in state court).

Tyler Meade
THE MEADE FIRM p.c.
California Office:
    12 Funston Ave., Suite A
    San Francisco, CA  94129
New York Office:
    111 Broadway, Suite 2002
    New York, NY  10006
Telephone: (415) 724-9600
tyler@meadefirm.com

Attorneys for Plaintiff