**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

WINKLEVOSS CAPITAL FUND, LLC,

          Plaintiff,

   v.

CHARLES SHREM,

          Defendant.

Case No.  18-cv-8250 (JSR)

**PLAINTIFF WINKLEVOSS CAPITAL FUND, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## Table of Contents

I.    INTRODUCTION ...............................................................................................1

II.   RELEVANT ALLEGATIONS..........................................................................1

III.  ARGUMENT ......................................................................................................4

    A.   THE COURT HAS SUBJECT MATTER DIVERSITY JURISDICTION BECAUSE THE AMOUNT IN
CONTROVERSY EXCEEDS $75,000...........................................................................4

       1.   *The Amount Is Determined From Good-Faith Allegations In The Complaint*...............4

       2.   *Shrem Cannot Show To A Legal Certainty That The Amount in Controversy Does Not
Exceed $75,000*.......................................................................................................4

          i.    WCF Is Entitled To 5000 Bitcoin As Equitable Relief Under Its Breach of Fiduciary
Duty, Constructive Trust And Accounting Causes of Action ...........................................6

          ii.   WCF Is Entitled To 5000 Bitcoin Under Its Fraud Cause of Action .......................10

    B.   FACTUAL ISSUES PRECLUDE DISMISSAL ...............................................................13

       1.   *WCF Has Properly Alleged Fraud*...............................................................................13

       2.   *WCF Has Properly Alleged Breach of Fiduciary Duty*...................................................17

       3.   *WCF Has Properly Alleged a Claim for a Constructive Trust* ....................................20

       4.   *WCF Has Properly Alleged a Claim for an Accounting* ..............................................21

IV.  CONCLUSION ................................................................................................23

## Table of Authorities

### CASES

*A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991) ...................................12

*Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ...........................17, 19

*Baker v. Drake*, 53 N.Y. 211 (1873) .........................................................................6

*Batterson v. Raymond*, 87 Misc. 229, 237 (Sup. Ct.) .....................................................22

*Birnbaum v. Birnbaum* .........................................................................................8

*Brozan v. Worms*, 138 Misc. 404, 406 (Sup. Ct. 1930) ..................................................21

*Chalem v. Bonime*, 155 A.D.2d 360 (1989) ..............................................................22

*Chase Manhattan Bank, N.A. v. American Nat. Bank*, 93 F.3d 1064, 1070 (2d Cir. 1996) ........4, 5

*Ciccone v. Hersh*, 530 F. Supp. 2d 574, 576 (S.D.N.Y. 2008) .........................................20

*City Bank Farmers' Tr. Co. v. Hewitt Realty Co.*, 257 N.Y. 62, 67 (1931) ...........................11

*Clark v. Pinney*, 7 Cow. 681, 1827 WL 2478 (N.Y. Sup. Ct. 1827) ...................................7

*Colt v. Owens*, 90 N.Y. 368, 371 (1882) ...................................................................6

*Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957 (2d Cir. 1987) ..................................16

*Design Strategies, Inc. v. Davis*, 367 F.Supp.2d 630, 645 (S.D.N.Y. 2005).............................8

*Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969) .......................................................8

*Excelsior 57th Corp. v. Lerner*, 160 A.D.2d 407, 408–09 (1990).......................................8

*Giblin v. Murphy*, 73 N.Y.2d 769, 772 (1988) ............................................................12

*Glass v. Springfield L.I. Cemetery Soc.*, 252 A.D. 319, 322 (App. Div. 1937) ......................9

*Guild v. Herrick*, 51 N.Y.S.2d 326 (1944) ...............................................................22

*Haight v. Haight & Freese Co.*, 112 A.D. 475, 476, (App. Div. 1906) ................................21, 22

*Halifax Fund, L.P. v. MRV Commc'ns, Inc.*, 2001 WL 1622261, at *6 (S.D.N.Y. Dec. 18, 2001)
...................................................................................................................10

*Hewlett v. Staff*, 235 A.D.2d 696 (3d Dept. 1997) ......................................................15

*Hijos De Daniel Espuny, S.A. v. Victor M. Calderon Co.*, 9 Misc. 2d 983, 984–85 (Sup. Ct. 1957)
...................................................................................................................9

*Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961) ...........................................4

*Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 87 (1924) ................................................11

*Howell v. Freifeld*, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986) .......................................17

*In re Khan*, 2014 WL 10474969, at *51 (E.D.N.Y. Dec. 24, 2014) ...................................12

*In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992) ........................21

*Latham v. Father Divine*, 299 N.Y. 22, 27 (1949) .......................................................21

*Levin v. Kitsis*, 82 A.D.3d 1051, 1054, 920 N.Y.S.2d 131, 135 (2011) ..............................17

*Lipkien v. Krinski*, 192 A.D. 257, 263 (App. Div. 1920) ...............................................22

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1075 (S.D.N.Y. 1990).12

*McGovern v. Best Bldg. & Remodeling*, 245 A.D.2d 925 (3d Dept. 1997) ...........................15

*McIntyre v. Whitney*, 139 A.D. 557, 561-62 (1910) ......................................................7

*Newton v. Wade*, 239 A.D. 742, 744 (1ˢ Dept. 1934) ....................................................7

*Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421 (1972) ....................................1, 12

*Pires v. Frota Oceanica Brasileira, S.A.*, 6 Misc. 3d 1036(A) (Sup. Ct. 2005)........................14, 15

*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) ..................................18

*Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007) ...........................................................12
*Saboundijan v. Bank Audi (USA)*, 556 N.Y.S. 2d 258, 260–61 (1990)...........................................18
*Saul v. Cahan*, 61 N.Y.S. 3d 265, 267 (2017) ...............................................................................19
*Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) .................5
*Schultz v. Commodities Futures Trading Com'n*, 716 F.2d 136 (2d Cir. 1983) ...........................6
*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, No. 18-CV-6658 (JSR), 2018 WL
  6378158, at *7 (S.D.N.Y. Dec. 6, 2018) ...................................................................14, 17, 23
*Tanzman v. La Pietra*, 8 A.D.3d 706 (3d Dept. 2004) ..................................................................15
*United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir. 1991) ...............................................18
*United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006) ...............................................................17
*United States v. Wolfson*, 642 F. 3d 293, 295 (2d Cir. 2011) .......................................................17
*White v. Davidson*, 150 A.D.3d 610, 611–12, (N.Y. App. Div. 2017)...........................................14
*Wright v. Bank of Metropolis*, 110 N.Y. 237, 247-48 (1888)..........................................................7
*Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982)....................................4, 5

## STATUTES

28 U.S.C. § 1332(a) ...................................................................................................................4, 5
28 U.S.C. § 1367(a) .......................................................................................................................6
N.Y.P.L. §§ 155.05.......................................................................................................................12
N.Y.P.L. §155.40..........................................................................................................................12
New York Judicial Law § 27(b) ...................................................................................................13

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY 564 (5th ed. 1979)................................................................................19

## TREATISES

Rest. 3d of Restitution and Unjust Enrichment .........................................................................1, 9
Restatement (Second) of Agency § 15 (1958) .............................................................................19

## I.     INTRODUCTION

It is black letter law that the amount in controversy for purposes of diversity jurisdiction is measured by the good faith allegations in a plaintiffs' complaint assessed at the time of filing. Winklevoss Capital Fund's ("WCF") complaint alleges that Defendant Charles Shrem ("Shrem") owes WCF 5000 bitcoin that he stole sometime in late 2012 or early 2013. At the time of filing, the 5000 missing bitcoin was worth over $31 million — well beyond the jurisdictional threshold of $75,000. Shrem cannot establish "to a legal certainty" that the amount in controversy does not exceed $75,000, a showing he must make to defeat federal jurisdiction.

Indeed, because he is a breaching fiduciary, this Court may force Shrem to disgorge all ill-obtained profits under its equitable powers to prevent unjust enrichment, a remedy assessed based on Shrem's status as a conscious wrongdoer. *See* Rest. 3d of Restitution and Unjust Enrichment §§ 1, 3, 43, 51-53; *Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421 (1972) (citing favorably the Rest. 1st of Restitution for the proposition that "[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered"). These sweeping powers to order restitution clearly put more than $75,000 in controversy.

Shrem also raises a number of issues related to the sufficiency of the Complaint, including that WCF has failed to state plausible factual allegations for fraud and breach of fiduciary duty. These arguments are nothing more than factual disputes that should be left for discovery and a determination by the jury. The Court should deny the motion to dismiss.

## II.     RELEVANT ALLEGATIONS

WCF is a family investment firm, founded in 2012 by twin brothers Cameron and Tyler Winklevoss. Complaint ¶ 2. In early-2012, the Winklevoss brothers met Shrem, who was one of bitcoin's earliest adopters. *Id.* at ¶¶ 11-12. Shrem held himself out as well-connected in the

1

bitcoin community, describing himself as a "bitcoin evangelist." *Id.* at ¶¶ 12, 15. At the time, the

Winklevoss brothers were investigating whether and how to invest in bitcoin *Id.* at ¶ 9. Shrem

promised to help the brothers buy large quantities of bitcoin as part of an effort to court the twins

to invest in the space. *Id.* at ¶ 14. Shrem promised that if WCF sent him money to buy bitcoin on

its behalf, he would buy bitcoin for WCF "at the best price," and that he would provide an

accounting. *Id.* at ¶¶ 1, 16, 22. Shrem never asked for a commission or any other payment. *Id.* at

¶ 16. Shrem also had connections to find sellers who had bitcoin in the large quantities that WCF

desired. *Id.* at ¶ 15. Because bitcoin was then in its infancy, the market was undeveloped and it

was difficult to buy tranches of bitcoin of any significant size. *Id.*

 Shrem's promise to (1) buy bitcoin for WCF at the best price, and (2) provide an

accounting to WCF over his use of its funds was reflected in several contemporaneous emails

with the Winklevoss Twins. *Id.* at ¶¶ 17, 22. For instance, on September 12, 2012 — the day

WCF wired its first funds to Shrem — Shrem promised Cameron Winklevoss that he would

"secure. . . the best price" for WCF. *Id.* at ¶¶ 18, 20. In December, Shrem again reiterated that

same promise in an email, *id.* at ¶ 18, even though he had already apparently stolen 5000 bitcoin

from WCF. *Id.* at ¶¶ 28-40.

 Implicit in Shrem's promise was that he would actually buy bitcoin for WCF and not for

himself. In reliance on Shrem's promise to purchase bitcoin on its behalf, WCF wired Shrem

$750,000 between September 12, 2012 and February 6, 2013 in several installments. *Id.* at ¶ 20.

WCF received 39,876.34 bitcoin in exchange at an average cost basis of $18.81/coin. *Id.* at ¶ 21.

 Shrem was given full control over all the details about how to spend WCF's money,

including where to buy, when to buy and at what price. *Id.* at ¶¶ 1, 14, 50. Shrem did not provide

an accounting to WCF until January 31, 2013, and even then it was woefully inadequate and

admittedly incomplete. *Id.* at ¶ 24. His initial accounting only reflected purchases of 8500

bitcoin, less than half of what Shrem had already sent to WCF. *Id.* at ¶ 24. When Shrem provided

some further details, the figures did not add up. *Id.* at ¶¶ 27-28. Ultimately, WCF hired an

accountant, Matthew Gruchevsky, to speak to Shrem and audit Shrem's accounting. *Id.* at ¶ 32.

Gruchevsky met Shrem on February 27, 2013. *Id.* at ¶ 33. Shrem thereafter provided

Gruchevsky with a spreadsheet and additional figures, but the accounting lacked essential details.

*Id*. at ¶ 34. Running balances, price paid per bitcoin and dollars spent were all missing from the

sheet. *Id*. at Ex. 1, Ex. A. When Gruchevsky audited Shrem's figures, he determined that Shrem

could not account for $61,000 of WCF's money sent to Shrem in September and October 2012,

which amounted to 5000 bitcoin. *Id*. at ¶¶ 34-36. When confronted with the discrepancy, Shrem

could not provide an explanation. *Id*. at ¶¶ 38-39. Shrem, in fact, stole the 5000 bitcoin. *Id*. at ¶

40. Indeed, he had perpetrated the same scheme on Matthew Mellon. *Id*. at ¶ 37. After a demand

from counsel, Shrem turned over unaccounted-for bitcoin to Matthew Mellow, but did not do so

for WCF. *Id*. at ¶¶ 37, 46.

Shrem went to prison in 2014, after pleading guilty to felony money laundering as part of

a scheme to sell bitcoin to drug dealers on the Silk Road, an underground black market. *Id.* at ¶

7.[1] Shrem also bragged in 2014 about being worth millions, which WCF suspects is owing to his

theft of its bitcoin. Complaint ¶¶ 47-48.

---

[1] As discussed in WCF's application for attachment, Shrem has had a meteoric rise to wealth since his release in 2016. Despite purportedly leaving prison with few assets, he has since acquired $ 4 million in real estate, two Maserati sports cars and two powerboats — all in cash. Dkt No. 24. He has publicly proclaimed that his real estate holdings represent just 1/3 of his total holdings, the balance being in traditional securities and cryptocurrency. *Id. See also* Dkt. No. 26, Ex. A. This puts Shrem's net worth at over $12 million, accumulated just in the last 18 months. During the Court's hearing on WCF's motion to confirm its ex parte Order of Attachment, Shrem acknowledged having over $2 million in cash in the bank. WCF believes that Shrem's meteoric rise to wealth since leaving prison is on account of the appreciated value of the bitcoin that he stole from WCF back in 2012 or 2013, when bitcoin was trading at less than 1% of its current value.

While the Complaint does not detail Shrem's recent meteoric rise to wealth, it could be amended to do so. Shrem has not contested WCF's evidence that he has recently purchased over $4 million in real estate in Florida, two Maseratis and two powerboats in cash. *See generally* Dkt. Nos. 26, 53. He has stated that he left prison in 2016 with either $16,000 or under $100,000 in assets. Dkt. Nos. 26, Ex. A, p. 14 ("I walked into prison with sixteen thousand dollars to my name"); 53, ¶ 8 ("After I was released from prison, I had a net worth of less than $100,000 and worked for approximately six months at a restaurant in Pennsylvania"). He has provided nothing more than a

### III.    ARGUMENT

**A.    THE COURT HAS SUBJECT MATTER DIVERSITY JURISDICTION BECAUSE THE AMOUNT IN CONTROVERSY EXCEEDS $75,000**

**1.    The Amount Is Determined From Good-Faith Allegations In The Complaint**

Diversity jurisdiction requires the amount "in controversy" to exceed $75,000. 28 U.S.C.

§ 1332(a). To assess whether a district court is vested with jurisdiction, courts are directed to

determine the amount in controversy from the complaint itself, unless the amount stated is "not

claimed in good faith." *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961) (citation

omitted); *see also Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982) ("The

jurisdictional determination is to be made on the basis of the plaintiff's allegations, not a decision

on the merits").

The Complaint asserts that Shrem stole from and owes to WCF 5000 bitcoin, an amount

equal to $31,362,500 at the time of filing. Complaint ¶¶ 1-3, 40. These allegations clearly vest

this Court with diversity jurisdiction. *Chase Manhattan Bank, N.A. v. American Nat. Bank*, 93

F.3d 1064, 1070 (2d Cir. 1996) ("The amount in controversy is determined at the time the action

is commenced") (quoting *Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784

(2d Cir. 1994)).

**2.    Shrem Cannot Show To A Legal Certainty That The Amount in Controversy Does Not Exceed $75,000**

---

vague description of his activities since then to explain his rags-to-riches success. *Id.* ("Since working at the restaurant, I have worked a variety of jobs that have allowed me to accumulate funds and to restore myself financially.") Shrem's conclusory and self-serving statements of financial success suggest that WCF should be entitled to probe whether Shrem's funds have been acquire legitimately, or whether he has been "successful" owing to the appreciation of the assets he stole from WCF.

Shrem has consistently failed to offer an explanation for his accounting irregularities and WCF's missing bitcoin that lies at the heart of this case. For example, in his opposition to WCF's motion to confirm attachment, Shrem provided no explanation for his incomplete accounting, instead only offering an untested defense as to the provenance of 5,000 bitcoin that flowed through his personal wallet in December 2012. Dkt. No. 45.

A federal court lacks diversity jurisdiction only where it appears "to a legal certainty" that no more than $75,000 is in controversy. *Id.* (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)). This is a high bar. "[T]he legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim. Even where [the] allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (citations and internal quotations omitted). The policy behind the substantial deference to a plaintiff's good-faith allegations is well-founded. It is designed to ensure that defenses on the merits are not entangled with jurisdictional questions that would complicate the jurisdictional analysis and carry jurisdictional questions forward throughout the litigation. *Zacharia*, 684 F.2d at 202. For this reason, the statute vests jurisdiction where the amount "in *controversy*" exceeds $75,000, not the amount of ultimate entitlement. 28 U.S.C. § 1332 (emphasis added).

Shrem masks several on-the-merits arguments as a jurisdictional challenge. He argues that WCF's damages remedies are so severely limited that even though its 5000 missing bitcoin were worth over $30 million at the time of filing, it cannot not recover more than $75,000. This Court should not permit this sideshow as Shrem cannot show "to a legal certainty" that the amount in controversy does not exceed $75,000. Shrem's arguments misstate the remedies available to WCF and hinge on disputed factual questions. And even accepting Shrem's interpretation of the caselaw, he cannot show to a "legal certainty" that the amount in controversy is not greater than $75,000.

WCF asserts four causes of action: (i) breach of fiduciary duty, (ii) fraud, (iii) constructive trust, and (iv) accounting. To defeat diversity jurisdiction, Shrem must show to a "legal certainty" that *all* of WCF's claims cannot exceed $75,000. If one of WCF's claims

satisfies the jurisdictional threshold, it is immaterial if the other claims do not, as the Court may properly assert supplemental jurisdiction over WCF's remaining claims that arise out of the same nucleus of operative facts. *See* 28 U.S.C. § 1367(a).

      i.        **WCF Is Entitled To 5000 Bitcoin As Equitable Relief Under Its Breach of Fiduciary Duty, Constructive Trust And Accounting Causes of Action**

Shrem argues that WCF's entitlement to damages for its claims of breach of fiduciary duty, constructive trust and an accounting is limited by the "highest intermediate price rule." Shrem MTD pp. 7-10. This rule limits recovery in conversion cases over property of a fluctuating value to the (i) time of conversion or the (ii) highest intermediate value between notice of conversion and a reasonable time thereafter in which the property could have been replaced. *Schultz v. Commodities Futures Trading Com'n*, 716 F.2d 136 (2d Cir. 1983). In invoking this rule, Shrem ignores an important exception to the highest intermediate price rule. In *Baker v. Drake*, 53 N.Y. 211 (1873) — the first case to establish the rule — the New York Court of Appeals held a more generous measure of recovery applies where, as here, "the purchase-price had been paid in advance." *Id.* at 222-223. The court explained, "where the purchaser has not paid for the goods, he may, on the refusal of his vendee to deliver, go into the market and buy goods of a similar quality, and that what it would cost him to do this is the just measure of his damages; but that where he has paid the purchase-money, it is unreasonable to require him to pay it a second time, and therefore all fluctuations in price should be at the risk of the vendor who refuses to deliver, while retaining the purchase-money." *Id.*; *see also Colt v. Owens*, 90 N.Y. 368, 371 (1882) (reaffirming that different considerations of damages arise where "the stocks have been paid for and are owned by the person for whom they are purchased", and that "it is unreasonable to require [a plaintiff] to pay it the second time, and, therefore, all fluctuations in price should be at the risk of the vendor who refuses to deliver,

6

while retaining the purchase-money"). Subsequent cases have also clarified that the rule in *Baker v. Drake* only applies where the defendant did not act in bad faith. *Wright v. Bank of Metropolis*, 110 N.Y. 237, 247-48 (1888) (discussing rule of *Baker v. Drake* as limited to cases where defendant wrongfully converts stock "in good faith"); *Newton v. Wade*, 239 A.D. 742, 744 (1st Dept. 1934) (noting that "cases of *innocent technical conversion* are governed by the rule laid down by the Court of Appeals in *Baker v. Drake*) (emphasis added); *Clark v. Pinney*, 7 Cow. 681, 1827 WL 2478 (N.Y. Sup. Ct. 1827).[2]

Further, the "highest intermediate price rule" measure of damages in conversion cases — which is designed to restore plaintiff to the position he was in prior to the breach — is distinct from the equitable remedies available to a plaintiff who (1) alleges wrongdoing by fiduciary, (2) requests a constructive trust, or (3) demands an accounting. The equitable remedies available for these causes of action include restitution, a remedy "measured by the defendant's gain rather

---

[2] Indeed, subsequent New York cases have refused to apply the highest intermediate price rule where the defendant has converted and misappropriated a plaintiff's stock. As stated thoroughly in *McIntyre v. Whitney*, 139 A.D. 557, 561-62 (1910):

> Independently of the fact that the rule of Baker v. Drake, applied to a case like this, would permit the defendants to retain a large part of the sum realized on the conversion of the plaintiff's property, the injustice of so applying it and its inapplicability become apparent upon further reflection. As already stated, the rule was intended solely to furnish indemnity to the customer for the loss of speculative profits. It is of course for the customer to determine for himself when he will terminate his venture. He is not obliged to sell on a falling market. But for the defendants' wrong, their assignee would have had the plaintiff's shares to deliver to him upon demand. He could then have held them indefinitely, and the fact that he responded promptly to every call for additional **\*562** margins, and, when the assignment was made, tendered the amount which he still owed and demanded his stock, strongly tends to indicate that that was his purpose. If he were seeking to hold the broker for loss of speculative profits, it would be entirely just to require him to replace the stock within a reasonable time after learning of the conversion so as to limit the amount of such speculative loss, and the amount which he would have to pay to replace the stock would furnish complete indemnity for the loss of speculative profits. As Judge Rapallo put it in the case of Baker v. Drake, it would manifestly be unfair to permit him then to lie by and hold the defendants for the highest price which the stock might attain over an indefinite period thereafter. But it is a very different thing to require that, having already advanced $30,000, he should, upon discovering the conversion, advance $26,000 more or incur an indebtedness for that amount for the purpose of replacing the stock in order that the broker, who wrongfully appropriated it to his own use, might retain from the proceeds of the conversion a sum equal to the amount of the decline in the market value after the conversion. The bare statement of the proposition refutes it.

than the plaintiff's loss." *Design Strategies, Inc. v. Davis*, 367 F.Supp.2d 630, 645 (S.D.N.Y. 2005) (citation omitted, noting constructive trust may be imposed as restitution).

As stated in *Birnbaum v. Birnbaum*:

> [I]f the defendant has made a profit through the violation of a duty to the plaintiff to whom he is in a fiduciary relation, he can be compelled to surrender the profit to the plaintiff. So also where the defendant wrongfully uses the property of the plaintiff in making a profit, he can be compelled to surrender the profit. The defendant will not be permitted to retain the profit in such cases even though there has been no loss to the plaintiff. The defendant should not be permitted to enrich himself by retaining the profit, and will therefore be compelled to surrender it to the plaintiff. In these cases, the effect of enforcing a constructive trust is not merely to put the parties in status quo

> The 'profit' that the fiduciary must be ordered to surrender can include the appreciation in the value of the misappropriated property (*Matter of Rothko*, 84 Misc.2d 830, 872–876, 379 N.Y.S.2d 923, *mod. on other grounds* 56 A.D.2d 499, 392 N.Y.S.2d 870, *affd.* 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291; *see, Menzel v. List,* 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742). As the Surrogate held in this case:

>> It would be totally untenable from an equitable and any other standpoint to permit benefits, which are substantial and impressive over the passage of this time, to inure to the perpetrator of the wrongdoing, in this instance Saul. Equity demands that the party aggrieved by the misconduct, in this instance the estate, be the beneficiary of the appreciation.

157 A.D.2d 177, 187–88 (1990). *See also Excelsior 57th Corp. v. Lerner*, 160 A.D.2d 407, 408–09 (1990) ("where claims of self-dealing and divided loyalty are presented, a fiduciary may be required to disgorge any ill-gotten gain even where the plaintiff has sustained no direct economic loss"); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969).

As a breaching fiduciary, Shrem is deemed a "conscious wrongdoer" under the Restatement (Third) of Restitution and Unjust Enrichment, meaning the calculation will be

performed in a manner that is most favorable to WCF.  Rest.3d of Restitution and Unjust
Enrichment §§ 1, 3, 43, 51-53.

The remedies available under an action for an accounting are likewise more expansive
than the highest intermediate price rule. In an action for an equitable accounting, a plaintiff is
entitled to recover damages for profits that a defendant might have made. *Hijos De Daniel
Espuny, S.A. v. Victor M. Calderon Co.*, 9 Misc. 2d 983, 984–85 (Sup. Ct. 1957), *aff'd sub
nom. Hijos De Daniel Espuny v. Calderon Co.*, 6 A.D.2d 697 (1958) ("An 'agent must, at the
option of his principal, account to him for any profit he might have made in the transaction'"
(quoting *Dutton v. Willner*, 52 N.Y. 312, 319 (1873)). Furthermore, "[t]he defendant's duty is not
merely to pay what may be due; it is to account first and then to pay, for without an accounting
the plaintiff cannot know the extent of the defendant's liability to him." *Glass v. Springfield L.I.
Cemetery Soc.*, 252 A.D. 319, 322 (App. Div. 1937) (citation omitted).

WCF alleges that Shrem failed to account for, and thus owes, 5000 bitcoin. Shrem has
not provided a complete accounting or disclosed the profits he has made as a result of his self-
dealing with WCF's funds. Shrem cannot plausibly say "to a legal certainty" at this stage in the
proceedings that the amount in controversy does not exceed $75,000 given (1) his failure to ever
provide a full accounting, and (2) the broad remedies available to WCF as a result of this
wrongdoing.

Even if the highest intermediate price rule applies (which WCF does not concede), Shrem
still cannot demonstrate to a legal certainty that the amount in controversy is below $75,000.
Indeed, the Complaint clearly shows otherwise. WCF alleges that it was not aware of the
deficiency in Shrem's provision of bitcoin until February 2013, when Shrem finally provided a
partial accounting. Complaint ¶ 34. At that point, the price of bitcoin was over $20 per coin,
Comp. Ex A at Ex. 1, meaning WCF's 5000 missing bitcoin was worth at least $100,000. As

9

Shrem acknowledges in his moving papers, under the highest intermediate value rule, WCF is entitled to the highest intermediate value of bitcoin "when WCF had notice of the purported conversion and a 'reasonable time' after WCF could attempt to reenter the market." Shrem MTD at p. 8. So even under Shrem's reading of the law, WCF has satisfied the $75,000 amount in controversy threshold.

Further still, it is an open factual question when WCF should have reentered the market. Shrem cannot show to a legal certainty that the amount in controversy does not exceed $75,000 within a "reasonable time" after WCF discovered Shrem's fraud. The price of bitcoin exceeded $15/coin in mid-January 2013. Complaint, Ex. 1, Ex. A. This means the 5000 missing bitcoin exceeded the amount-in-controversy requirement before Shrem provided his first accounting to WCF. Complaint ¶ 24 (Shrem provides first accounting on January 31, 2013); Ex. 1, Ex. A (tracing price of bitcoin). Shrem cannot say to a legal certainty that a jury would find that WCF should have re-entered the market by mid-January to cover for Shrem's fraud. Indeed, at that point WCF still had no clarity on the amount of bitcoin that was missing and Shrem was still promising to provide an accounting. *Id.* ¶¶ 24-27. WCF could not have known what to "cover" before Shrem provided an accounting. The "reasonable time" analysis typically leaves a plaintiff "at least a 'reasonable opportunity to consult counsel.'" *Halifax Fund, L.P. v. MRV Commc'ns, Inc.*, 2001 WL 1622261, at *6 (S.D.N.Y. Dec. 18, 2001). That could not have happened until WCF had exhausted its demand to Shrem. Given that Shrem mislead WCF for several months and withheld what he considered a complete accounting through the end of February 2013, it is an open factual question as to when WCF should have re-entered the market and sued Shrem for damages.

   ii.  **WCF Is Entitled To 5000 Bitcoin Under Its Fraud Cause of Action**

Given the above discussion, the Court need not reach the question of what damages remedies are available to WCF under its cause of action for fraud, because WCF has clearly passed the jurisdictional threshold on its other causes of action. In any event, WCF has also crossed the jurisdictional threshold under its claim of fraud.

Shrem argues that WCF is limited to its direct pecuniary losses stemming from the fraud. Shrem MTD at pp. 6-7. But WCF's actual pecuniary losses are 5000 bitcoin, not $61,000. The Complaint alleges that Shrem failed to send WCF 5000 bitcoin it was duly owed and instead funneled such bitcoin to himself. Complaint ¶ 40. WCF's injury was felt and sustained in bitcoin, not dollars. WCF is entitled to recover damages "proximately caused" by Shrem's fraud, not necessarily just the money that it sent to Shrem in the first place. *Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 87 (1924). The fact that Shrem sent WCF other bitcoin only underscores that the loss was felt in bitcoin and that he still owes WCF 5000 bitcoin. *Id.* at ¶ 21. At minimum, there is an open factual question to be determined by a jury whether Shrem's fraud is the proximate cause of a loss of $61,000 or 5000 bitcoin.

Contrary to Shrem's argument in his motion to dismiss, WCF is not seeking lost profits. WCF is not seeking damages related to profit opportunities that it might have realized had it been given the 5000 bitcoin. It is seeking the 5000 bitcoin it lost owing to Shrem's fraud and embezzlement. The allegations in the Complaint are that Shrem purchased 5000 bitcoin for WCF but never actually transmitted such bitcoin to WCF. Complaint ¶ 40. 5000 bitcoin is WCF's actual pecuniary loss. But for Shrem's fraud, WCF would have 5000 more bitcoin.

In any event, Shrem has not presented any case that suggests the out-of-pocket damages rule limits a Court's equitable powers to grant other remedies where appropriate to prevent unjust enrichment. Nor could he, as fraud is a well-recognized and ancient ground for seeking equitable relief. *City Bank Farmers' Tr. Co. v. Hewitt Realty Co.*, 257 N.Y. 62, 67 (1931)

11

(Pound, J.). Fraud is one of the often-enumerated bases for invoking equitable powers and preventing unjust enrichment. *In re Khan*, 2014 WL 10474969, at \*51 (E.D.N.Y. Dec. 24, 2014); *Paramount*, 30 N.Y.2d at 42; *see also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1075 (S.D.N.Y. 1990) ("disgorgement is a mechanism by which the equitable remedy of restitution is effectuated" and is proper measure of damages in a fraud case).

Yet even crediting Shrem's characterization of WCF's pecuniary losses as merely $61,000, WCF still crosses the amount-in-controversy threshold. The actual pecuniary loss rule cited by Shrem does not establish "to a legal certainty" that the amount in controversy is below $75,000.

First, punitive damages may be included in the Court's analysis of the amount-in-controversy. *See A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991) ("[I]f punitive damages are permitted under the controlling law, the demand for such damages may be included in determining whether the jurisdictional amount is satisfied"). Under New York law, punitive damages are available in cases of fraud when a plaintiff establishes that the "defendant's wrongdoing is not simply intentional but evinces a high degree of moral turpitude." *Ross v. Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 489 (2007). Where the fraud suggests wanton dishonesty as to imply criminal indifference to civil obligations, punitive damages are appropriate, even if the fraud is not attended by harm to the public. *See Giblin v. Murphy,* 73 N.Y.2d 769, 772 (1988).

Here, WCF alleges that Shrem intentionally stole its bitcoin while he held himself out as a trusted agent. That act amounts to a Class C felony in New York. N.Y.P.L. § 155.05 (larceny statute), N.Y.P.L. §155.40 (larceny over $50,000 punishable as a class C felony). Furthermore, the Complaint also alleges that Shrem's fraud was identical to the exact same scheme he perpetrated on another individual. Complaint ¶ 37. Punitive damages may thus be properly

considered within the amount in controversy, as a jury would certainly be entitled to impose such damages in this case.

Second, under New York Judicial Law § 27(b), the Court may properly issue a judgment denominated in bitcoin. ("In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation"). Under section 27(b), the judgment may be issued in bitcoin, which is converted to dollars on the day of judgment at then-prevailing rates. Because 5000 bitcoin was worth over $30 million at the time of filing, section 27(b) puts the amount in controversy above $75,000.

### B.    FACTUAL ISSUES PRECLUDE DISMISSAL

#### 1.    WCF Has Properly Alleged Fraud

WCF does not dispute that Shrem has articulated the correct standard as to the elements of misrepresentation. WCF must prove that Shrem made a material misstatement that he knew to be untrue at the time it was uttered. However, this is a matter that should be tested in discovery and is not the proper basis for a motion to dismiss.

WCF alleges that Shrem lured WCF into using Shrem as a broker for bitcoin on the false promise that he would buy bitcoin for them "at the best price." Complaint ¶¶ 15-19. Implicit in that statement was that he would buy bitcoin for WCF in the first place and hand over the bitcoin as he was obliged to do. WCF is not suing Shrem for his failure to realize the best price as Shrem suggests. Nor is this a dispute over representations about speculative future events, such as what the price of bitcoin would be in the future. This is a suit over a classic con — that Shrem lured WCF to part with its money, which he intended to use to buy bitcoin for himself rather than for WCF. WCF is entitled to explore in discovery and prove at trial that Shrem's plan all along was never to fulfill his promises to WCF.

13

Courts have not hesitated to allow fraud claims to proceed where, as here, plaintiffs have alleged that defendants induced them to entrust funds for one purpose, while all along intending to usurp those funds for their own ends. *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, No. 18-CV-6658 (JSR), 2018 WL 6378158, at *7 (S.D.N.Y. Dec. 6, 2018) is instructive. In that case, Judge Rakoff noted just a few days ago:

> SHIP alleges that defendants never intended to manage SHIP's assets as represented, but that they planned all along to divert SHIP's funds to the benefit of Platinum and themselves. This allegation is supported by numerous factual assertions in the complaint, such as that defendants tunneled over $35 million of SHIP's assets to a Platinum-owned fund only two weeks after the BAM IMA was executed. . . . To the extent that defendants misrepresented their present intention to misappropriate SHIP's assets, they engaged in actionable fraudulent inducement.

*See also White v. Davidson*, 150 A.D.3d 610, 611–12, (N.Y. App. Div. 2017) (denying motion to dismiss where defendants "made specific representations concerning the actions that they would undertake to promote plaintiff's single in order to induce him to self-fund their promotional campaign while never intending to perform, and were, in effect, engaging in a Ponzi scheme").

WCF's allegations more than state a plausible and particularized claim, including allegations that Shrem spent months trying to cover up for his fraud, *id.* at ¶¶ 22-39, and that he pulled the same con on another unsuspecting individual. *Id.* at ¶ 37. Shrem was given an opportunity in this litigation to explain, on the record, what happened to WCF's missing funds and his accounting inconsistencies. He provided none. Six years after the fact Shrem still has no explanation for what happened. Dkt. No. 45.

WCF's Complaint more than states a plausible claim for fraud. Shrem's inexplicable behavior when confronted with accounting errors and his failure to rectify his mistakes raise a clear inference of plausible fraud. As stated in *Pires v. Frota Oceanica Brasiliera, S.A.*, 6 Misc. 3d 1036(A) (Sup. Ct. 2005):

> Mr. Heller's changing and contradictory explanations for why he
> took more than four million dollars from his client Mr. Pires

14

> without telling him, give credence to plaintiffs' claims that defendant fraudulently converted half of plaintiff Pires' judgment award and induced Mr. Rudes to waive his charging lien and remove his name from defendant's check. Mr. Heller's actions, the sworn statements submitted in support of the motions, the sudden appearance of a retainer agreement, and Mr. Heller's failure to deny the material facts in both motions including that he has secreted the funds he wrongfully took from Pires in bank accounts in Europe, demonstrate that Mr. Heller acted with an intent to defraud plaintiffs.

*Id.* at *5.

Shrem's own case citations underscore the need for this case to move to discovery. *Tanzman v. La Pietra*, 8 A.D.3d 706 (3d Dept. 2004), upon which he primarily relies, was decided *after* a full jury trial on the merits. Likewise, the *McGovern v. Best Bldg. & Remodeling*, 245 A.D.2d 925 (3d Dept. 1997), was decided after discovery on summary judgment, wherein the court found that there was no evidence to support a claim that the defendant made a statement of future expectancy with a present intent to deceive. WCF must likewise be permitted explore its fraud allegations in discovery, with the aim of proving that Shrem's representations about promising to buy bitcoin for WCF at the best price on September 12, 2012, Complaint ¶ 18 and in December 2012, *id.* at ¶ 19, were untrue at the time they were uttered.

*Hewlett v. Staff*, 235 A.D.2d 696 (3d Dept. 1997), is similarly unhelpful. In that case, the plaintiff sued certain partners over their statements that she would not be personally liable for any obligations of the partnership. However, she executed personal guarantees on behalf of the company. In such a context, the court properly held that the defendants' representations that she would not bear personal liability in the future were nothing more than mere expressions of opinion or future expectation and not actionable as fraud. The Court found that there were no "factual allegations to demonstrate that the assurances were statements of intent to do something in the future, made with the knowledge that the acts will not in fact be performed or with the present intention not to perform them." *Id.* at 697. Here, by contrast, WCF has alleged numerous

15

facts that plausibly raise the inference that Shrem intended to defraud WCF all along, including that he provided evasive answers to WCF's demand for an accounting and that he perpetrated the same fraud on another individual.

Contrary to Shrem's citation to *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957 (2d Cir. 1987), WCF need only generally allege scienter. WCF must simply state plausible allegations from which the Court can infer the requisite state of mind. *Id.* at 963 ("While Fed.R.Civ.P. 9(b) does not require that scienter be pleaded with great particularity, a plaintiff, nevertheless, must allege circumstances that provide at least a minimal factual basis for allegations of scienter"). WCF has not given just a conclusory statement of Shrem's intent but has alleged the numerous acts that suggest the Court can plausibly infer fraudulent intent. These include: (1) the fact that Shrem repeatedly lied to WCF about "buying bitcoin at the best price" (implying he would buy bitcoin in the first place) even *after* he had already stolen 5000 bitcoin from WCF, Complaint ¶ 19; (2) his subsequent failure to provide a complete and accurate accounting, despite multiple opportunities to come forward with an explanation for his accounting discrepancies, *id.* at ¶¶ 22-39; and (3) allegations that he pulled the exact same con on another individual. *Id.* at 37.

Shrem's alternative argument that WCF has not alleged reliance makes no sense. WCF relied on Shrem's statement that he would buy bitcoin "at the best price," which implied that he would actually buy bitcoin for WCF and not himself. WCF only discovered that Shrem failed to do so only when he could not explain the missing bitcoin. Complaint ¶ 31. Shrem argues that WCF should have been able to do its own accounting, but WCF could not know the precise days and at what price Shrem bought bitcoin on its behalf as those details were left to Shrem's discretion. Complaint ¶ 1. An accounting was impossible without Shrem.

In any event, fraud is broader than mere misrepresentation. WCF is entitled to prove either fraud by concealment or constructive fraud, both of which are recognized under New York law. *See Levin v. Kitsis*, 82 A.D.3d 1051, 1054, 920 N.Y.S.2d 131, 135 (2011) (describing standards for both concealment and constructive fraud). The allegations in the Complaint equally support either of these theories of fraud.

### 2.      WCF Has Properly Alleged Breach of Fiduciary Duty

The test for establishing a fiduciary relationship is well spelled out in *Abercrombie*:

> To determine if a fiduciary relationship exists, "New York law inquires whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.,* 833 F.Supp. 344, 349–50 (S.D.N.Y.1993). Thus, a fiduciary duty exists where one assumes control and responsibility over another, or where one has a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking. *See id.; see also Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (App.Div.1987) (noting that a "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (quoting Restatement (Second) of Torts § 874 cmt. a)). "Examples of fiduciary relationships include the relationships between trustee and beneficiary, guardian and ward, agent and principal, and attorney and client." *Wilson–Rich v. Don Aux Assocs., Inc.,* 524 F.Supp. 1226, 1234 (S.D.N.Y.1981).

*Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006). *See also Senior Health*, 2018 WL 6378158 at *3-5 (describing elements of fiduciary relationship under New York law) (Rakoff, J.).

Under these standards, WCF has clearly alleged enough facts to survive a motion to dismiss. It is blackletter law that an agent with discretionary authority over a principal's monies is a fiduciary with respect to management of the funds. *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006). Shrem had such control over WCF's funds, his discretion circumscribed in only one respect: use the entirety of the funds to purchase bitcoin at the best price. Complaint ¶¶ 1, 14-16. Plainly, a fiduciary duty existed. *See also United States v. Wolfson*, 642 F. 3d 293, 295 (2d Cir. 2011); *Howell v. Freifeld*, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986).

17

Even where a manager's fiduciary duties are narrowed, such as where the broker is given the mere task of executing trades for a non-discretionary account maintained by a sophisticated investor, a manager is a fiduciary with respect to the "narrow task of consummating the transaction requested." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999); *see also Saboundjian v. Bank Audi (USA)*, 556 N.Y.S. 2d 258, 260–61 (1990) (holding that even in a non-discretionary account, the failure to execute a sale when the security reached price the plaintiff specified stated a claim for breach of fiduciary duty).

Shrem, of course, was given much more authority than "the narrow task of consummating the transaction[s] requested." Shrem also held himself out as a bitcoin insider at the time (which WCF was not), and WCF relied on that self-presentation before entrusting Shrem with considerable funds. *Id.* at ¶ 15. Shrem made specific promises that he would act for WCF's benefit and in good faith and asked for nothing in return. *Id.* at ¶ 4, 16-19. He was given complete authority over $750,000; WCF cabined this authority in only one respect, requiring Shrem to purchase bitcoin at the best price. Complaint ¶¶ 1, 14-16, 19.

The cryptocurrency context may be new, but the fiduciary concept is not. *See United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir. 1991) ("At the heart of the fiduciary relationship lies reliance, and de facto control and dominance").

Shrem was also clearly WCF's agent. WCF sent a total of $750,000 to Shrem over the course of several months in late 2012 and early 2013, and Shrem was tasked with buying bitcoin at the best possible price. Complaint ¶¶ 16, 20. All details of this assignment were left entirely to Shrem's discretion. *Id.* at ¶ 14. Shrem also promised an accounting, *id.* at ¶ 22, which is a hallmark requirement of a fiduciary, further evincing that Shrem understood himself to be a

18

fiduciary. These allegations clearly establish an agency relationship, a quintessential fiduciary relationship.[3]

The Complaint should not be dismissed at this stage because "[t]he existence of a fiduciary duty normally depends on the facts of a particular relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie*, 438 F. Supp. 2d at 274.

Shrem argues that dismissal is warranted because his relationship with WCF was an ordinary "arms-length" commercial relationship, which typically does not give rise to a fiduciary relationship. This entirely ignores the parties' principal/agent relationship, and also ignores the fact that Shrem required no consideration for his services. Complaint ¶ 16.

Shrem also argues that WCF has alleged in a conclusory fashion that it placed trust and confidence in Shrem, but WCF went far beyond placing trust and confidence in Shrem — it entrusted him with $750,000, over which he was supposed to act for WCF's benefit. Complaint ¶ 20. This is well beyond merely alleging that WCF placed trust and confidence in Shrem. Indeed, the case that Shrem cites to suggests WCF merely asserts "trust and confidence," *Abercrombie*, did not involve the plaintiff entrusting the defendant with money to act on its behalf.

Shrem's reliance on *Cahan* is also misplaced. In *Cahan*, the defendant received a "consulting fee" and acted solely as an art advisor to the plaintiff, leaving the ultimate decision to purchase artwork to the plaintiff. *Saul v. Cahan*, 61 N.Y.S. 3d 265, 267 (2017). The

---

[3] BLACK'S LAW DICTIONARY 564 (5th ed. 1979) (One acts in a fiduciary capacity when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part"); Restatement (Second) of Agency § 15 (1958) (stating that agency "is a fiduciary relation" and noting that "if the principal requests another to act for him with respect to a matter, and indicates that the other is to act without further communication and the other consents so to act, the relation of principal and agent exists").

relationship lacked the traditional hallmarks commonly associated with a fiduciary relationship, such as discretionary control over funds.

*Ciccone* similarly offers no recourse. In *Ciccone*, the Defendant — like in *Cahan* — acted solely as an advisor to the Plaintiff. *Ciccone v. Hersh*, 530 F. Supp. 2d 574, 576 (S.D.N.Y. 2008). While the Defendant's investment advice ultimately proved worthless, the actual authority and discretion to make investments remained with the Plaintiff. *Id.* at 576-77 ("The [investments] were nondiscretionary, meaning that Plaintiffs retained full responsibility for trading decisions with respect to the Annuity and only Plaintiffs were authorized to make changes to the Investments"). Shrem's position with respect to WCF, and the authority he retained to make investment decisions on its behalf, is diametrically opposed to those of the defendant in *Ciccone*. Shrem, not WCF, was responsible for trading decisions.

Shrem also suggests that WCF has not alleged any injury stemming from a breach of fiduciary duty, but the argument is frivolous. WCF alleges that Shrem failed to account for $61,000 of WCF's money, which he used to buy 5,000 bitcoin for himself in a rampant act of self-dealing. Complaint ¶ 52.

### 3.     WCF Has Properly Alleged a Claim for a Constructive Trust

Shrem's argument that WCF is not entitled to a constructive trust is entirely derivative of his argument that WCF is not entitled to damages for breach of fiduciary duty. In that respect, WCF refers the Court to its argument, *see* § III.B.2, *supra*, that it has adequately alleged a breach of fiduciary duty.

Furthermore, WCF need not even establish that Shrem was a fiduciary in order for the Court to invoke its equitable powers to impose a constructive trust over any ill-gotten proceeds that Shrem received as a result of his abuse over WCF's funds. While the guideposts for imposition of a constructive trust are (1) a confidential or fiduciary relationship, (2) a promise,

20

express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment, *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992), (citing cases), New York Courts have "at times dispensed with one or more of these requirements." *Id.* Even without a fiduciary relationship, "a person wrongfully acquiring property can be treated as a constructive trustee." *Id.* at 353-54. "The key factor is unjust enrichment, not willfully wrongful misconduct." *Id.* "Its applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v. Father Divine*, 299 N.Y. 22, 27 (1949).

Finally, that Shrem has deposited $61,000 into escrow with this Court does not end the constructive trust analysis. Even if the evidence does not turn out to support that Shrem purchased 5000 bitcoin with WCF's $61,000, WCF is still entitled to trace the proceeds and profits of the $61,000 under a constructive trust. Rest. 3d of Restitution §§ 55, 58, 59. Thus, WCF may be entitled to more than the $61,000 that Shrem has placed into escrow, which is not a perfect substitute for a constructive trust.

### 4.    WCF Has Properly Alleged a Claim for an Accounting

Shrem's argument that WCF is not entitled to an equitable accounting is entirely derivative of his argument that WCF is not entitled to damages for breach of fiduciary duty. In that respect, WCF refers the Court to its argument, *see* § III.B.2, *supra*, that it has adequately alleged a breach of fiduciary duty, which would entitle it to an equitable accounting. *See also Brozan v. Worms*, 138 Misc. 404, 406 (Sup. Ct. 1930) ("When one advances money to stockbrokers to invest in securities, the relation is fiduciary and equity will take jurisdiction of an action brought against the brokers for an accounting") (quoting *Haight v. Haight & Freese Co.*, 112 A.D. 475, 476, (App. Div. 1906), aff'd, 190 N.Y. 540, 83 N.E. 1126 (1907)).

Courts have found an accounting required in almost exactly parallel circumstances as here:

> In this case Brooks stood relatively to Marvin as his agent to purchase for him one-half of the Ward interest, and when intrusted with Marvin's money to be so applied, at a price to be by him determined, and to cover the whole of an unknown interest, he stood in a fiduciary relation, and became a quasi trustee of the money in his hands and of the property purchased, and Marvin has the right to call him to an account in equity.

*Haight*, 112 A.D. at 478 (quoting *Foley v. Hill*, 2 H. of L. Cas. 28). *See also Chalem v. Bonime*, 155 A.D.2d 360 (1989) ("The plaintiff complains that he never received his stock and that defendant converted the plaintiff's contribution to the defendant's own use. We are satisfied that, accepting all of plaintiff's factual averments as true, the complaint states causes of action for declaratory relief and for an accounting."); *Guild v. Herrick*, 51 N.Y.S.2d 326 (1944); *Lipkien v. Krinski*, 192 A.D. 257, 263 (App. Div. 1920) ("The law is well settled that, where a customer deposits with brokers moneys to be used in the purchase of securities, a fiduciary relationship arises between them entitling the plaintiffs to require the defendants to account in a court of equity for any of the plaintiffs' moneys which they have received").

The fact that Shrem has provided a series of incomplete accounts does not relieve him of his obligation to provide a full account. *Batterson v. Raymond*, 87 Misc. 229, 237 (Sup. Ct.) ("mere accounts rendered from time to time by trustees to the cestui que trust do not constitute an account stated").

22

### IV.    CONCLUSION

For the foregoing reasons, Shrem's Motion to Dismiss should be denied.[4]

DATED: December 10, 2018                    Respectfully submitted,


By:      */s/ Tyler Meade*

Tyler Meade
THE MEADE FIRM p.c.
12 Funston Ave., Suite A
San Francisco, CA 94129
Telephone: (415) 724-9600
tyler@meadefirm.com
*Attorneys for Plaintiffs*

---

[4] In the event the Court finds an inadequacy in any allegations, WCF requests leave to amend. *See Senior Health*, 2018 WL 6378158 at *13 (Rakoff, J.) (granting leave to amend on dismissed claim of, *inter alia*, fraud).

23