IB8QWINc

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    WINKLEVOSS CAPITAL FUND LLC

4                   Plaintiff

5           v.                          18 Civ. 8250 (JSR)
                                        Conference
6    CHARLES SHREM
                 v.
7    GARNISHEE LOCAL BIT COINS USA, INC.,
     GARNISHEE BITTREX, INC.
8                   Defendants

9    ------------------------------x
                                        New York, N.Y.
10                                      November 8, 2018
                                        11:30 a.m.
11
     Before:
12
                         HON. JED S. RAKOFF
13
                                        District Judge
14
                             APPEARANCES
15
     THE MEADE FIRM
16        Attorneys for Plaintiff
     SAM FERGUSON
17   TYLER MEADE

18

19   BAKER MARQUART LLP
          Attorneys for Defendant Shrem
20   BRIAN KLEIN
     TERESA HUGGINS
21

22   BRAFMAN & ASSOCIATES PC
          Attorney for Defendant
23   MARC AGNIFILO

24

25
```

IB8QWINc

1          (Case called)

2          DEPUTY CLERK:  Will the parties please identify

3     themselves for the record.

4          MR. MEADE:  Good morning, your Honor.

5          Tyler Meade for plaintiff.  With me is my associate,

6     Samuel Ferguson.  We're waiting on certificates of merit before

7     we file his pro hac vice application.  I will be doing all the

8     arguing today.

9          THE COURT:  OK.

10         MR. KLEIN:  Good morning, your Honor.

11         Brian Klein for Mr. Shrem who is here in court.  With

12    me is Teresa Huggins, who is also applying to be admitted in

13    the Southern District and is awaiting, but she is admitted to

14    the New York Bar; just a matter of time.  I'll be doing the

15    talking.

16         THE COURT:  New York bar is one thing.  The Southern

17    District is something else.  Very good.

18         I want to spend most of the time on the attachment,

19    but before we get to that, let's deal with the case management

20    plan.  Thank you very much for submitting it.  And basically it

21    looks fine with one exception or two exceptions.

22         Why in the world do you want to wait around until

23    December 4 to serve the first request for documents which would

24    just preclude later requests, and the very limited, very simple

25    interrogatories permitted by Local Rule 33.3(a) which are the

IB8QWINc

1    only interrogatories I permit.  I would think you could do that

2    tomorrow.  Why, December 4?

3              MR. MEADE:  Your Honor, Todd Meade for plaintiff.  We

4    would agree to an earlier date.

5              THE COURT:  OK.

6              MR. MEADE:  I think within a week would be

7    appropriate.

8              THE COURT:  That sounds fine.

9              Does defense counsel disagree with that?

10             MR. KLEIN:  Your Honor, I think originally plaintiff's

11   counsel put a later date, and we wanted it to be sped up.

12   We're newer to this case.  They have been involved a lot

13   longer, so --

14             THE COURT:  But even today you must know some

15   documents you want.  And this is only the first request for

16   production of documents.  It doesn't preclude later ones.

17             As for interrogatories, the interrogatories under the

18   local rule mainly ask for the names of persons with knowledge,

19   which presumably you would like to know sooner rather than

20   later.

21             MR. KLEIN:  I was going to say we're fine with moving

22   it up.

23             THE COURT:  Very good.

24             MR. KLEIN:  I'm just explaining how we got there.

25             THE COURT:  That's OK.  I thought I'd give you a hard

IB8QWINc

1    time anyway.

2              MR. KLEIN:  OK.

3              THE COURT:  So we will change that to -- let's see,

4    today is the 8th.  So we'll make it November 15.

5              In terms of other dates, they all look fine, so we'll

6    set this down for a final pretrial conference as well as oral

7    argument on any summary judgment motion for April 8 at --

8              DEPUTY CLERK:  As long as they're willing to go to

9    Pasadena, any time you'd like.

10             THE COURT:  I'm in Pasadena?

11             DEPUTY CLERK:  Yes, sir.

12             MR. KLEIN:  We're in Los Angeles, so we're fine with

13   that.

14             THE COURT:  Back when?

15             DEPUTY CLERK:  Back on the 12th.

16             THE COURT:  I'll be sitting on the Ninth Circuit, and

17   you're not there yet in this case, so -- when am I back?

18             DEPUTY CLERK:  Back on the 12th.  And we could do

19   3:30.

20             THE COURT:  3:30 on April 12.  So I've signed the case

21   management.

22             MR. KLEIN:  Your Honor, maybe I'm reading this wrong.

23   Is the trial date the 8th?

24             THE COURT:  That's the ready-for-trial date.

25             MR. KLEIN:  OK.

IB8QWINc

1        THE COURT:  What that means is that no one can be

2   heard to complain that they need -- they're not ready for

3   trial.  I usually set the trial date at the time of the final

4   pretrial conference.  Unlike my late colleague, Milton Pollack,

5   who would have set it for the next day, I guarantee you will

6   have a little time, but the point is to make sure everything is

7   wrapped up at your end by April 8 so that when I set the trial

8   date, I can set it in accordance with what makes sense in terms

9   of the Court's schedule and the witnesses' schedule but not

10   anything about outstanding discovery or outstanding motions.

11   All of that is wrapped up.

12        MR. MEADE:  If I may, your Honor, I just want to alert

13   the Court that I do have a federal trial set before Judge

14   Fischer on April 23.  I do have a long-planned personal

15   vacation for the month of May.  If there is a possibility of

16   the Court setting it, then I would ask it not be set for May,

17   but if it is, I need to tell my colleagues for the trip

18   probably sooner rather than later.

19        THE COURT:  Maybe we should set the trial date now

20   then so that everyone can schedule things around it.

21        How long of a trial -- if it went, maximum how long of

22   a trial do you think it will be?

23        MR. MEADE:  As I sit here today, I could put my case

24   on in two days.  I don't know if discovery is going to maybe

25   add a day.  I would be surprised if it took me more than three

IB8QWINc

1    days.

2              THE COURT:  All right.  How about defense counsel?

3              MR. KLEIN:  Knowing the order we go through their

4    witnesses too, I would say a couple extra days.  At this early

5    stage, your Honor, we just started to investigate, so I would

6    say a week in total.

7              THE COURT:  That sounds fine.

8              MR. KLEIN:  One point.  We don't have permission to

9    bring our electronics in here, so I don't have my calendar in

10   here.

11             THE COURT:  This is the great Catch 22, the rules of

12   this Court.  Everyone has their calendar on their cell phone.

13   We don't allow them to bring their cell phones and, thus, we

14   are able to schedule trials that are of maximum inconvenience

15   to all the parties.

16             Here is what we will do:  I will agree to a June trial

17   but no later under any circumstances whatsoever.  Let me look

18   at the dates that I'm not available.  So I am sitting on the

19   Ninth Circuit again the week of the 10th, and there is a Second

20   Circuit Judicial Conference the week before that, so I think we

21   are talking June 17.

22             As far as defense counsel knows at this point, does

23   that work for you as well?

24             MR. MEADE:  It does work for plaintiff, your Honor.

25             MR. KLEIN:  As far as I know right now, yes.

IB8QWINc

1          THE COURT:  OK.  If that's a problem after you

2     retrieve your electronics, get your adversary and call my

3     chambers by no later than tomorrow.  But one way or another, I

4     really don't see doing it later than June 17.  So if that

5     doesn't work for you, we may have to find a date in April or

6     May.  I'm sorry about that, but that may be what we have to do.

7          MR. MEADE:  Certainly, your Honor.

8          THE COURT:  Very good.  I have signed the case

9     management plan.  It will be filed electronically and be

10     available to both sides, and I'll give it to my courtroom

11     deputy to docket.

12          Now, let's now turn to the attachment.  I see in the

13     courtroom Mr. Agnifilo.  He recently won an acquittal in this

14     Court, and I think he's pressing his luck, but here he is

15     again.

16          So maybe someone can tell me with direct knowledge,

17     was a schedule worked out for the payment of the forfeiture

18     amount or not?

19          MR. KLEIN:  Your Honor, if you mean if the schedule

20     has been worked out with the government?

21          THE COURT:  Yes.

22          MR. KLEIN:  There has not been, as far as I know, a

23     discussion where they worked out an exact payment plan.

24     Mr. Shrem has made two payments, and he intends to pay it off

25     before his probation is up.  So, the first payment was made

IB8QWINc

1  before he learned of this lawsuit.  He made another payment on

2  Monday, a substantial payment.  He's fully committed to abiding

3  by the order and paying it off.  If it needs to be paid off

4  sooner, not on a payment plan, he's willing to do that.

5         THE COURT:  How much does he currently owe?

6         MR. KLEIN:  790, I believe, your Honor.  No.  No.  I'm

7  sorry.  Yes, your Honor, my math is right, 790.

8         THE COURT:  You see, this is an unusual situation

9  because he was in those days impecunious, so I didn't impose

10  any restitution.  I can see from his suit that he's found

11  better employment these days.

12         But there was a forfeiture amount and the government's

13  forfeiture order which I did not notice at the time, but I

14  notice today in looking at it did not impose a schedule, which

15  is unusual when there is no restitution.

16         So I think -- and, I'm sorry, if I had focused on this

17  earlier, I would have asked the government to have someone here

18  today, but I think we will have to enter into a schedule, and

19  for that purpose, I think you will need to convene a conference

20  call not with the plaintiff in this case but with the

21  government's representative and yourself to work out a schedule

22  for the payment of that forfeiture.

23         MR. KLEIN:  Your Honor, is the conference call with

24  the Court or just directly with the government to work out that

25  plan?

IB8QWINc

1          THE COURT:  No, I'm sorry.  Mr. Agnifilo should be on

2    that call, really, rather than you.

3          MR. KLEIN:  That's why I asked.

4          THE COURT:  Yes.  Thank you very much.

5          MR. AGNIFILO:  That is fine.  I predicted this course

6    so I wanted to be here so that I can make that happen.

7          THE COURT:  Let me now turn to the attachment.

8          So the plaintiff makes much of the failure to pay the

9    forfeiture amount, but it does not appear that there was any

10   schedule set for payment of the forfeiture amount, so that's

11   not the only ground for the attachment, but it certainly was

12   one of the grounds.

13         So what about that?

14         MR. MEADE:  Yes.  Thank you, your Honor.

15         Well, your Honor's question goes to the heart of

16   attachment, and I think a misunderstanding in this case.  Under

17   Section 6201, there are alternative paths to attachment.  We

18   relied on two, and either one would work.

19         I will note that most of Mr. Shrem's brief concerns

20   Subsection 3, which is basically indications of hiding assets

21   or taking them out of state.

22         We also relied -- and I think this is the primary

23   grounds for our attachment -- on Subdivision 1, and that

24   provides for an attachment if the defendant is a

25   non-domiciliary residing without the state.  And that's clearly

IB8QWINc

1    met.  After Subdivision 1, were the orders to show that it is

2    disjunctive.  We do not have to show that he is actually trying

3    to hide assets.  I think there are indications that he

4    certainly is, and I think we could meet that standard, but we

5    don't have to show it.

6           I would refer your Honor to the *Hotel 71 Mezzanine*

7    *Lender* case, which is a New York Court of Appeals decision.

8    It's 14 NYS 3rd.  I'll direct your Honor's attention to page

9    310.

10          THE COURT:  Was this cited in your papers?

11          MR. MEADE:  It was.

12          THE COURT:  Go ahead.

13          MR. MEADE:  "One purpose of attachment is to provide

14   security for a potential judgment against a non-resident

15   debtor."  So I think the fact that Mr. Shrem lives in Florida

16   is enough.

17          That said, your Honor also has discretion in this

18   matter.  And so I do think it is appropriate to talk about

19   whether there is evidence under Subdivision 3, which is

20   basically hiding or secreting assets.  I just have a couple

21   brief points to make on that if your Honor would like to hear

22   them.

23          THE COURT:  Yes.

24          MR. MEADE:  We know he has purchased a primary

25   residence in Florida for north of $2 million.  We have cited

IB8QWINc

1    your Honor the provision of the I think it's the Florida

2    Constitution, which says that's basically immune from judgment.

3            THE COURT:  That's the well-known Florida Homesteading

4    exception of the -- and Mr. Agnifilo would be guilty of

5    malpractice if he had not told his client about that.  So go

6    ahead.

7            MR. MEADE:  Yes.  Thank you, your Honor.  Maybe I

8    should take it up with him.

9            In any event, we also know that he has stated

10   publicly -- and he hasn't disavowed these statements before

11   your Honor -- that he holds a third of his assets in real

12   estate, and that's presently 4 million, according to public

13   records.  And he says he holds a third of his assets in Crypto.

14   So that would be another 4 million.  And a third of his assets

15   in perhaps more conventional holdings.

16           We've served 30 different institutions and took almost

17   three weeks after the attachment order issued to figure out

18   where we might find assets.  As I'm sure your Honor has

19   noticed, we've attached tentatively less than $10.  So we are

20   dealing with a situation in which Mr. Shrem is certainly

21   sophisticated in the Crypto currency world, and by his own

22   admission holds substantial assets in the Crypto currency

23   world.  I'm not saying that there's anything wrong with that,

24   but what I am saying --

25           THE COURT:  What's the totality of what you believe he

IB8QWINc

1    owes?

2            MR. MEADE:  Well, we believe it's the value of 5,000

3    bitcoin.  There will be a debate about whether that's at the

4    time of judgment or the high value.

5            THE COURT:  I'm just asking you, if you had to put a

6    dollar figure on what he owes you now, this is not binding, but

7    just give me a ballpark.

8            MR. MEADE:  5,000 bitcoin at 6,500, which it's been a

9    pretty steady price of late, that translates to north of

10   $32 million.

11           THE COURT:  All right.

12           Let me hear from your adversary, and we will come

13   right back to you.

14           MR. MEADE:  Thank you, your Honor.

15           MR. KLEIN:  Your Honor, to address that point, first

16   of all, "In practice, courts" -- and this is cited in their own

17   application.  This is on page 11.

18           "In practice, courts generally refrain from granting

19   attachment orders based solely on" -- I'm paraphrasing --

20   "Section 6201 frame 1.  Instead of requiring a further showing

21   that the defendant is either likely to lack sufficient assets

22   to satisfy an adverse judgment or is likely to hide or dispose

23   of assets."  They have not met that burden, your Honor.

24           THE COURT:  As to the very quote you give, it shows

25   it's discretionary.  It's not an absolute requirement.  But

IB8QWINc

 1    they say that they have no idea after some pretty diligent

 2    preliminary work where your client is keeping his assets.  So

 3    where is his keeping his assets?

 4              MR. KLEIN:  Your Honor, I would just note one thing.

 5    When they said they've gone and sought garnishment at multiple

 6    places and no money is there, if they had found money, they

 7    would be coming in and saying, "Look he has our assets.  He

 8    must have made them."

 9              So either way we lose under their argument.  If they

10    go to where they are, and they are not there, they're going to

11    say, well, he's hiding them.  If they go to where they are and

12    he has a ton of assets, they're going to say, "Look, these are

13    our assets.  Now we can seize them all.  I just wanted to point

14    that out as a starting point.  Mr. Shrem has his assets in real

15    estate mostly.

16              THE COURT:  Real estate where?

17              MR. KLEIN:  In Florida.

18              At the time that statement was made, the price of

19    bitcoin was approximately $20,000.  It has gone down from 20 to

20    about 6.  So the amount of his assets would have shrunk

21    dramatically and has shrunk dramatically.  So there is no

22    evidence -- and this is what I would focus on -- their

23    allegation is an unaccounted for $61,000; not an unaccounted

24    5,000 bitcoins.  We've proven definitively, your Honor, that

25    those bitcoins that they claim throughout their application --

IB8QWINc

1   and it's very explicit: "E stole 5,000 bitcoins.  E bought

2   5,000 bitcoins.  He has 5,000 bitcoins.  They say that

3   explicitly.  They don't couch it in any other terms.  He has

4   them.  We have proven definitively he does not have the 5,000

5   bitcoins.  He has made a statement in his declaration he

6   doesn't have 5,000 bitcoins.  We've shown who the actual

7   possessor is: John Doe.  So that's the whole premise of their

8   attachment.  It's not that he hasn't paid his forfeiture.  They

9   do raise that point, but it says he actually has 5,000

10  bitcoins.

11          If you look at paragraph two of their complaint, they

12  say that there.  If you look at the application, they say that

13  there.  I pulled up a list of times they say it, your Honor.

14  Direct references in their application, they say, "As WCF has

15  only recently learned, trends of evasive behavior and

16  incomplete accounting masked the fact that he actually stole

17  the 61,000 from WCF and converted it into 5,000 bitcoins for

18  himself."  That's not true, your Honor.  We've proven that.

19          They go on to say, "Shrem used money from WCF" -- this

20  is page 14 -- "to buy bitcoin for himself, defrauding his

21  principals of 5,000 bitcoins."

22          They say at the beginning:  "A forensic accounting

23  reveals that Shrem diverted approximately $61,000 of $750,000

24  entrusted to him to purchase bitcoin for his own accounts.  At

25  then prevailing prices, he was able to purchase and pocket

IB8QWINc

1    approximately 5,000 bitcoin.  That's all linked to the 5,000

2    bitcoins we know were not his.

3              THE COURT:  So what I am trying to get a handle on

4    though is -- this is going to be relevant both for this case

5    and for the schedule that I am to set up for payment of the

6    forfeiture.

7              MR. MEADE:  Sure.

8              THE COURT:  So his current assets are real estate in

9    Florida.  Yes?

10             MR. KLEIN:  Yes, your Honor.

11             THE COURT:  Including not just his home but other real

12   estate?

13             MR. KLEIN:  Investment properties I understand, your

14   Honor.

15             THE COURT:  Yes.  And they would not be subject to the

16   Florida attachment, the Florida Homestead Law.  The home is,

17   but not the others.

18             Cryptocurrency of one sort or another.  Yes?

19             MR. KLEIN:  Very minimal cryptocurrency, your Honor.

20             THE COURT:  What other assets does he have?

21             MR. KLEIN:  He has about $2 million in cash in his

22   bank account, your Honor.

23             THE COURT:  OK.

24             MR. KLEIN:  We would say this dispute is not about

25   $30 million.  It's about what they claim is an unaccounted for

IB8QWINc

1   $61,000.  They have no proof and they put no proof in this

2   record, and there will be no proof that he went out and

3   purchased any bitcoin with that money.  So we will put $61,000

4   in escrow, your Honor, to cover that.  Mr. Shrem was willing to

5   do that.  That is what this is basically about.  But to go out

6   and get an order that he is basically subjected to $30 million

7   in a preattachment order based on a false premise of these

8   5,000 bitcoins, your Honor, that should be struck.  That should

9   be dissolved.  And, frankly, he should get attorney's fees

10   going through all this effort.  I recognize that's a big ask,

11   but we do feel strongly about that.

12           THE COURT:  Well, if and when that is ripe, you will

13   take up that, but certainly not right at the moment.

14           Let me hear from plaintiff's counsel.

15           MR. MEADE:  Yes, your Honor.

16           So we alleged that Mr. Shrem took $61,000 and

17   purchased bitcoin.  Why do we think he purchased bitcoin?

18   Well, he is very involved in the Crypto space.  By his own

19   admission repeatedly, he has extensive holdings in Crypto.

20   It's a logical inference.

21           Now, we did make allegations about a $5,000 transfer

22   that ultimately landed most of it in coin base and Zappo.  I

23   will accept for purposes of today's hearing that they've made a

24   showing that that is probably Mr. Shrem's bitcoin.  I do want

25   to check on that later.  But we still sit here years later, and

IB8QWINc

1    Mr. Shrem has never provided an explanation for the

2    discrepancy.

3              I would like to direct your Honor's attention to the

4    Gruchevsky declaration, the final page of it, page 7, paragraph

5    22.  That's just one instance in which we outline for your

6    Honor where we actually showed him the analysis and said,

7    what's the explanation?  He still hasn't given it, not even

8    today.

9              What he has done, he has said, "The 5,000 that you saw

10   on the block chain two months later, that wasn't harmed."

11   Let's accept that as true.  It doesn't mean that he didn't take

12   5,000 bitcoin.  There has been no showing to the contrary.

13             THE COURT:  Let me ask you a different question.  It

14   seems to me the more I hear about this case that it is a

15   relatively simple case as federal cases go.  I'm wondering

16   whether going back to the case management plan, we shouldn't

17   put everything on a much quicker schedule and have the trial in

18   like January or February because there are clear areas of

19   dispute but they don't involve massive amounts of discovery or

20   huge motion practice or anything like that.  I wonder whether

21   it doesn't make sense -- I would only do this if both sides

22   agree, but I'm wondering whether we ought not to try this case

23   maybe in February.

24             MR. MEADE:  Well, it's an interesting idea, your

25   Honor, and I think it bears on the trial schedule as well.  It

IB8QWINc

1   is not often you stand in federal court and say you can present

2   a case of this size in two days, maybe three.  So I think it is

3   a constructive suggestion.  I would say that that timeline

4   would not allow for a motion for summary judgment.  We don't

5   intend to bring one because we think it's going to be a

6   fact-intensive dispute.  We don't think that would be worth the

7   Court's time and time on the schedule.

8           We would agree to move quickly.  I would probably

9   prefer the existing schedule, but I would not oppose an earlier

10  trial date if your Honor felt that was appropriate.

11          THE COURT:  Let me go back to defense counsel.

12          MR. KLEIN:  Your Honor, they have had years to do

13  their work on this case and to do whatever accounting work

14  they've done.  We got this case two weeks ago.  We think we

15  need the time that is permitted under the current schedule.  If

16  we find out we can go ahead sooner, we will let your Honor

17  know.

18          THE COURT:  I'm not going to hold my breath on that

19  one.

20          MR. KLEIN:  Since 2013, they have been working on this

21  case.  Mr. Meade sent a demand letter in 2013.  We just got

22  involved.  There is -- presumably we're going to be pouring

23  through these records and looking at them and doing some

24  discovery about them, so I think we need the time we have now.

25          THE COURT:  All right.  We will leave it as is.  So

IB8QWINc

1    I'm going to make a decision on the attachment by no later than

2    5:00 p.m. tomorrow.  It remains in place till then, although I

3    think we're talking about $10 if I understand the reality it.

4              MR. KLEIN:  Your Honor, I just want to make two last

5    points.

6              THE COURT:  Yes, go ahead.

7              MR. KLEIN:  I think what they're doing is burden

8    shifting.  The burden is on them.  This is a really harsh

9    remedy.  That's what the case law says.  You have discretion,

10   but it is an incredibly harsh remedy and the burden is on them.

11   What you just heard from plaintiff's counsel is speculation.

12   We believe he took 61,000 of our money, and we believe he

13   should have purchased it because he's a bitcoin guy.

14             The only evidence they've offered so far we've

15   indisputably proven wrong.  This case is about $61,000.  Again,

16   Mr. Shrem will put up $61,000.

17             THE COURT:  Well, I'm going to take you up on that

18   part independent of where I come out on the attachment.  So you

19   should place $61,000 in escrow with the Clerk of the Court and

20   send me a proposed order to that effect, and I'll either sign

21   it or play with it if it's not the right language.

22             MR. KLEIN:  Yes, sir.

23             MR. MEADE:  Your Honor?

24             THE COURT:  Yes.

25             MR. MEADE:  If I may briefly, your Honor, when we get

IB8QWINc

1    to the point of restitution, we'll be looking at the

2    restatement third of restitution that treats a state reaching

3    fiduciary as a conscious wrongdoer and a set of rules that are

4    favorable to the plaintiff follow.  For present purposes, our

5    client has entrusted him with money to buy bitcoin, so they're

6    entitled to bitcoin.

7         Lastly, if an attachment order issues, there's

8    probably some housekeeping details that we would need to raise.

9    There are three of them.  I can mention them now or file --

10        THE COURT:  No, go ahead.

11        MR. MEADE:  Number one, we would ask that Mr. Shrem

12   disclose what his holdings are, what he owns and where,

13   including Crypto holdings because I do believe the attachment

14   application isn't just $10.  His intangible personal assets are

15   also included.  That's under the *Hotel 71 Mezzanine* decision

16   because we have personal jurisdiction over him.  Your Honor

17   has, subject to your discretion, the jurisdiction to attach

18   Crypto holdings, bank account holdings, and real estate out of

19   the -- well, any proceeds.

20        THE COURT:  So let me just interrupt you for a minute.

21   If I continue the attachment, which I may or may not do, that

22   is what I'm going to decide by tomorrow, I will probably then

23   order disclosure of certain assets that were referred to here

24   in court.  So that will be part of the attachment if the

25   attachment continues.  So we will see on that.  I agree, I

IB8QWINc

1    don't think you need to go searching the world.  We will find

2    out where Mr. Shrem's assets are if the attachment continues.

3              MR. MEADE:  Great.  Thank you.

4              Two very quick points.  There are a few garnishees who

5    did not file garnishee statements.  There are a couple of them

6    that we really want to hear from, so if an attachment order

7    issues, I will probably bring a motion for an order to show

8    cause to prompt them.

9              THE COURT:  Yes.

10             MR. MEADE:  Then, lastly, if an attachment order

11   issues, we've agreed on $50,000 per month.  We didn't want to

12   have a dispute before today, but if an attachment order issues,

13   we will probably ask for an itemization of his expenses so we

14   can determine whether that amount is reasonable.

15             THE COURT:  I don't know how anyone can live on just

16   $50,000 a month, but he'll have to bear up somehow.

17             Let me hear from defense counsel if there is anything

18   further he wanted to say.

19             MR. KLEIN:  Your Honor, it should be noted that

20   Mr. Shrem since he's been released has to file regular

21   financial disclosure reports to the probation which fully

22   disclose all his financial holdings.  I hadn't said it earlier,

23   but he has been in compliance with the probation terms.  He has

24   been in good compliance.  He has been fully disclosing his

25   assets throughout the course of the last two years to the

IB8QWINc

1    probation office.  I think that needs to be out there.

2            THE COURT:  Yes, but the question is whether he should

3    be required to disclose it to plaintiff.

4            MR. KLEIN:  I understand, your Honor.  The Court has

5    access to those and what you would see when he was released, he

6    went into a halfway house.  He worked at a restaurant.  He had

7    in total I think less than $20,000 in assets.

8            THE COURT:  So I had even at the time I sentenced him,

9    a favorable view of Mr. Shrem.  That is why I gave him what I

10   considered to be quite a low sentence.  And he said at the time

11   of his sentence that when he got out, he intended to resume his

12   work in the bitcoin area because he saw that as the wave of the

13   future.

14           So I have no problem whatsoever with the fact that he

15   has carried out that plan, but that's just background to the

16   specific dispute that brings us here.  The specific dispute is

17   the claim that he ripped off the plaintiff or not.  So that's a

18   much more narrow issue.

19           MR. KLEIN:  I understand that, your Honor, but I think

20   the point is they claim that he ripped the plaintiff off and

21   used those assets to accumulate his wealth.  That's not true,

22   your Honor.  And so that's why they want to attach his current

23   assets.

24           THE COURT:  I'm not sure why it matters.  If he ripped

25   off the plaintiff, which of course you deny --

IB8QWINc

1            MR. KLEIN:  Yes.

2            THE COURT:  -- but if he ripped off the plaintiff for

3     whatever reason, because it was a slow-down and he wanted --

4     and said, "Oh, God, it's Thursday already, and I haven't ripped

5     off anyone," he would still be liable.  I'm not saying

6     motivation is irrelevant.  It's always there, but I'm not

7     following why you think it's important.

8            MR. KLEIN:  The point is if the dispute is over

9     whether he used $61,000 properly, whether he purchased it for

10    WCF, or whether he used it for his own purposes.  They have no

11    proof that he purchased anything with it.  They don't know what

12    happened to the money.  There is no evidence they know anything

13    happened to that money.  To order an attachment for up to 5,000

14    bitcoins, which we've shown he didn't purchase, makes no sense.

15    An attachment of $61,000, we would still dispute it, but that

16    would at least make sense based on what they've alleged.  If

17    you look at actually what they've alleged, your Honor, and you

18    look closely, that is what this dispute is about, is whether he

19    used $61,000 improperly.

20            So if someone came in and said, "Brian, go buy some

21    potted plants, here's ten bucks."  And I don't go buy potted

22    plants, and somehow I was supposed to buy this potted plant and

23    it became worth a worth a gazillion dollars --

24            THE COURT:  The only place to find potted plants, as

25    you well know, is in a courtroom.

IB8QWINc

1          MR. KLEIN:  My point is, five years later because of

2     unforeseen events in the rise of bitcoin, to claim $30 million

3     at a point when it's worth 6,000, they could have filed a suit

4     at any other point in time leading up to this when the value

5     was much, much lower.  To seek an attachment based on a

6     speculative value that they are seeking today is not fair to

7     Mr. Shrem.

8          THE COURT:  I thank both counsel for very helpful

9     arguments.  I look forward to the rest of this case because I

10    can see I do have excellent lawyers before me.

11         So I will get you a bottom-line order by 5:00

12    tomorrow.  There will probably be an opinion that follows,

13    which I probably won't have the chance to do until after

14    tomorrow, but at least the bottom-line attachment is on or

15    attachment is off, and here are its terms if it is on, et

16    cetera.

17         Separate from that though, the escrow deposit should

18    be made.  Certainly send me the order no later than Monday of

19    next week.

20         Mr. Agnifilo, get your counter part of the U.S.

21    Attorney's Office, and we'll work out a schedule for the

22    forfeiture.

23         MR. KLEIN:  Your Honor, there is one small procedural

24    issue.  Sorry.

25         THE COURT:  Yes.

IB8QWINc

1          MR. KLEIN:  There is a redacted filing that we would

2     like to talk about.  If we could approach to talk about it,

3     your Honor.

4          THE COURT:  Sure.  Come to sidebar.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB8QWINc

1          (At the side bar)

2          THE COURT:  This portion of the transcript will be

3     sealed subject to further determination by the Court.

4          Go ahead.

5          MR. KLEIN:  Your Honor, when we filed the redacted

6     version of the Shrem affidavit and the exhibit that's redacted

7     to remove the identifying information of John Doe, we learned

8     subsequently that if you went on to it, you would search the

9     PDF, you typed the name of the person in and it would go to the

10    blacked-out portion.  So what we would like to do, and we

11    called the Court this morning, the Clerk to see how we can

12    replace that so you can't do something accidentally, some savvy

13    tech person, not me, learns how to do that.  What we'd like to

14    do is substitute in a version that can't be searched.

15         THE COURT:  Got it.  Any problem?

16         MR. MEADE:  No.

17         THE COURT:  That's fine.

18         MR. KLEIN:  What we propose is we email it?  How do we

19    do that?  The Clerk wants to hear from you.

20         THE COURT:  Yes.  So send it to me.  I will docket it

21    with an order amending the previous order of yesterday so that

22    it's clear there's been a slight change.

23         MR. KLEIN:  Thank you, your Honor.

24         MR. MEADE:  Thank you, your Honor.

25         (In open court)

IB8QWINc

1          THE COURT:  I'm not sure given how that played out at

2     the sidebar that we need to seal the sidebar.  Do we?

3          MR. MEADE:  I think you want to for a brief period of

4     time.  You could probably unseal it next week.

5          MR. KLEIN:  I think, your Honor -- after we submit, I

6     think you could unseal it next week.

7          THE COURT:  Fine.  As you know from prior proceedings,

8     I am not a big fan of sealing things.

9          MR. KLEIN:  We understand, your Honor.

10         THE COURT:  Very good.  OK.  Anything else?

11         MR. MEADE:  Nothing for plaintiff.

12         MR. KLEIN:  Nothing from defendant.

13         THE COURT:  Thanks very much.

14         (Adjourned)

15

16

17

18

19

20

21

22

23

24

25